Greggar S. ISAKSEN d/b/a Applewood Stove Works, Plaintiff-Appellant,

v.

VERMONT CASTINGS, INC., Defendant-Appellee.

No. 86–2818.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1987.

Decided Aug. 4, 1987.

and without submission of the government's brief.

Trayton L. Lathrop, Isaksen, Lathrop, Esch, Hart, & Clark, Madison, Wis., for plaintiff-appellant.

Edwin J. Huges, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for defendant-appellee.

Before POSNER and FLAUM, Circuit Judges, and WILL, Senior District Judge.[*]

POSNER, Circuit Judge.

A dealer in woodburning stoves, Isaksen, claims in this suit that his supplier, Vermont Castings, coerced him to raise his retail prices for its stoves, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. There are also pendent claims, which the district court dismissed before trial, and of which more anon. The jury returned a verdict of $100,000 in damages, which was trebled as required by law, but then the district judge granted Vermont Castings judgment notwithstanding the verdict, noting in passing that the damage award was in any event excessive. 644 F.Supp. 1098 (W.D.Wis.1986). Isaksen appeals.

This is a rather sorry excuse for an antitrust case, which may more than anything explain the district judge's action in granting judgment for Vermont Castings. Founded in 1975, Vermont Castings has, as the plaintiff admits, only 10 percent of the midwestern "market" in free-standing woodburning stoves (which are used for heating). We have difficulty understanding how free-standing woodburning stoves could be a meaningful product market, given such excellent substitutes as oil-burning and gas-burning furnaces; and how, even if they do compose a meaningful product market, a product shipped all over the country can be said to be sold in distinct regional markets. But even ignoring these problems, we would have difficulty understanding how a 10 percent factor in a tiny market could restrain competition (viewed as a means of promoting economic efficiency—the contemporary antitrust view, see, e.g., *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 375 (7th Cir.1986)) merely by placing a floor under its dealers' prices ("resale price maintenance"). If the floor were set higher than necessary to induce dealers to provide the point-of-sale services that would maximize the sales of Vermont Castings' stoves, Vermont Castings not only would be transferring wealth from itself to its dealers (and why would it want to do that?) but would be pricing its stoves out of the market; consumers would switch to competing products whose retail prices were not inflated by resale price maintenance. It is easy to see, however, why, whether or not it possessed any market power, Vermont Castings might want to set the lowest floor under the retail prices of its stoves that would induce its dealers to provide the level of point-of-sale services that maximizes the welfare of consumers. See Telser, *Why Should Manufacturers Want Fair Trade?*, 3 J. Law & Econ. 86 (1960). As a new company, selling a somewhat complex product, Vermont Castings needed and still needs dealers who understand the product, can explain it to consumers, and can persuade them to buy it in preference to substitute products made by more established firms. These selling efforts, which benefit consumers as well as the supplier, cost money—money that a dealer can't recoup if another dealer "free rides" on the first dealer's efforts by offering a discount to consumers who have shopped the first dealer. (The second dealer can afford the discount because he doesn't have to incur the selling expenses that were incurred by the first dealer.) As one of Vermont Castings' dealers explained in a letter to it, "The worst disappointment is spending a great deal of time with a

[*] Hon. Hubert L. Will of the Northern District of Illinois, sitting by designation.

customer only to lose him to Applewood [Isaksen] because of price.... This letter was precipitated by the loss of 3 sales of V.C. stoves today [to] people who[m] we educated & spent long hours with." A retail price floor prevents such free riding and thus encourages dealers to provide necessary point-of-sale services. And the supplier has every incentive to keep the floor as low as is consistent with assuring adequate services, since he doesn't want to make his product noncompetitive.

Yet as Isaksen keeps reminding us, arguments of this sort have not persuaded the Supreme Court to relax the judge-made rule, now more than 75 years old, that makes resale price maintenance illegal per se under section 1 of the Sherman Act, regardless of the circumstances of its adoption. See *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 102–03, 100 S.Ct. 937, 941–42, 63 L.Ed.2d 233 (1980). So all we must determine, on the liability phase of this case, is whether Isaksen put in enough evidence of resale price maintenance to get to the jury.

 Vermont Castings gave a suggested retail price list to all its dealers, together with assurances that the prices were only suggested and that the dealers could sell at any price they wanted. Isaksen sold way under list price, and competing dealers bombarded Vermont Castings with complaints about him; the letter we quoted was one of these complaints. Beyond this the evidence is sharply contested, but of course we must view it as favorably to Isaksen as the record warrants, since the jury found in his favor; nor can we disregard the verdict merely because almost all of the evidence favorable to Isaksen came from his own mouth.

 Isaksen testified that when Vermont Castings discovered how low his prices were, it began to threaten him, and otherwise harass him, in a variety of ways. Although Vermont Castings denies any harassment, this was something for the jury to sort out. Harassment by itself, however, would not violate section 1 of the Sherman Act, a section that punishes only contracts, combinations, and conspiracies in restraint of trade and thus requires concerted action; harassment is unilateral. If, though, the harassment were pursuant to an agreement between Vermont Castings and its other dealers, the agreement to harass would be actionable. But there is insufficient evidence to justify an inference of agreement between Vermont Castings and its other dealers. Complaints to a supplier, made by competitors of a dealer who is cutting prices below suggested levels, are not, standing alone, evidence of agreement. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984); see also *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 661 (7th Cir. 1987); *Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1439–40 (7th Cir.1986), and cases cited there. They may merely alert the supplier to the existence of a condition injurious *to him,* thus entitling him to take action to protect himself, regardless of the dealers' motivations in complaining. Vermont Castings may, as we have seen, have had its own reasons for wanting every dealer to sell at its suggested retail prices; so the fact that it may have harassed Isaksen in an effort to obtain his compliance is not evidence that it was acting in concert with the other dealers. Yet there is no other evidence of such concert.

With a conspiracy between Vermont Castings and its other dealers ruled out, the harassment of Isaksen could be actionable under section 1 of the Sherman Act only if it succeeded in getting him to agree to raise his prices. Vermont Castings could not concert with itself and was not proved to have concerted with any of its other dealers. The only agreement between it and Isaksen that could (on this record) have violated the antitrust laws would have been an informal agreement by Isaksen, knuckling under to pressure by Vermont Castings, to raise his prices.

 Isaksen testified that Vermont Castings told him to raise his prices or it

would mix up his orders and that in response to this threat he did raise his prices. The fact that Isaksen may have been coerced into agreeing is of no moment; an agreement procured by threats is still an agreement for purposes of section 1. See *Albrecht v. Herald Co.*, 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872 n. 6, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 45, 80 S.Ct. 503, 512, 4 L.Ed.2d 505 (1960). A conspiracy is not less sinister because some of its members are intimidated, rather than bribed, into joining it. Some cases even say that the plaintiff in a "vertical" price-fixing case such as this (that is, a case where the alleged price-fixing agreement is between firms at different levels in the production-distribution process, rather than between competing firms) must prove he was coerced. See, e.g., *Bender v. Southland Corp.*, 749 F.2d 1205, 1212 (6th Cir.1984). But all they mean is that a plaintiff who is an involuntary participant must prove that the defendant induced his participation by conduct that went beyond merely announcing a policy of terminating dealers who sell below suggested retail prices; for such an announcement is privileged under *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). See *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 707 (7th Cir.1984).

Isaksen also testified, however, that although the threat was made in September 1982, he didn't raise his prices until a year later. He admits that during the entire year Vermont Castings never carried out its threat to mix up his orders. The timing casts serious doubt on the existence of a causal relationship between the threat and the raising of prices, for how can it be that the threat did not move him to act until the passage of time had shown the threat to be empty? He could have had other reasons for wanting to raise his prices in September 1983, including an expensive advertising campaign that he conducted in the fall of that year. Moreover, with one ambiguous exception the acts of harassment of which he complains (such as Vermont Castings' omitting him from a list of its dealers

in a newspaper ad it ran) occurred *after* he finally raised his prices, rather than before.

 Although such an analysis of the evidence might have furnished compelling grounds for granting Vermont Castings' motion to set aside the verdict as contrary to the clear weight of the evidence—and may yet do so, since the district judge has never ruled on the motion—it does not support the grant of judgment notwithstanding the verdict. Such judgment is proper only if, when the evidence is viewed in the light least favorable to the moving party, the verdict is unsupported. Given Vermont Castings' incentive to get Isaksen to agree to raise his prices, and his testimony that he did so, albeit belatedly, in response to Vermont Castings' threats, we cannot conclude that the verdict had no basis in the evidence. However, the verdict may, as we have said, have been so contrary to the weight of the evidence, as evaluated by the district judge in light of the witnesses' credibility and other relevant considerations, that a new trial is warranted. That is, the district judge might conclude that the verdict was not reliable enough to justify terminating the litigation without the additional confidence that a second verdict, rendered by a different jury, might impart if it agreed with the first verdict. This is a discretionary determination that must, if only because it involves a consideration of the witnesses' credibility, be made by the district judge rather than by the court of appeals. On the difference between the standards for motions to grant judgment notwithstanding the verdict and motions for a new trial because the verdict was against the clear weight of the evidence, and on the difference in the appellate court's role in reviewing orders ruling on the two types of motion, see *Spanish Action Committee v. City of Chicago*, 766 F.2d 315, 319–21 (7th Cir.1985).

 In defending the judgment, Vermont Castings points us to a footnote in *Monsanto Co. v. Spray-Rite Service Corp., supra*, 465 U.S. at 764 n. 9, 104 S.Ct. at 1471 n. 9:

The concept of "a meeting of the minds" or "a common scheme" in a distributor-

termination case includes more than a showing that the distributor conformed to the suggested price. It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer.

Vermont Castings reads this literally, to mean that unless Isaksen said to it, "I agree to adhere to your suggested retail prices," there was no agreement for purposes of section 1. If footnote 9 is interpreted in this way, however, a more explicit agreement would be required to establish concerted action under the Sherman Act than to establish a contract enforceable under the Uniform Commercial Code. We imagine that all the Court meant was that the mere fact of adherence to suggested retail prices does not establish an agreement to adhere to them. (But see Hay, *Vertical Restraints After Monsanto*, 66 Cornell L.Rev. 418, 435 (1985), adopting—and effectively criticizing—the literal reading.) If adherence alone could prove an agreement to adhere, the *Colgate* privilege—which allows a supplier to "coerce" the dealer's adherence by threatening to cut him off if he doesn't adhere, and which was strongly reaffirmed in *Monsanto, supra*, 465 U.S. at 763–64, 104 S.Ct. at 1470–71; see 7 Areeda, Antitrust Law ¶ 1446, at 85–86 (1986)—would be nugatory. Footnote 9 is a part of the discussion reaffirming *Colgate*. If a manufacturer distributes a price list, together with an announcement that he will cut off dealers who sell below the list prices, and dealers adhere to those prices because they don't want to be cut off, there is a realistic sense in which the threat of termination has induced the dealers to agree not to cut prices—to agree, in other words, to fix prices. That is the argument against *Colgate*. *Monsanto* rejects it. Nor can a dealer be allowed to manufacture an agreement by saying "I agree to abide by your suggested prices," when he has not been asked to agree. But we do not think the Court intended to go so far as to rule that if a supplier telephones a dealer and tells him, "Raise your price by next Thursday, or I'll ship you defective goods," and the dealer merely grunts, but complies, this is not actionable as an agreement to fix the dealer's resale price. If it were not, there would be very little left of the rule against vertical price-fixing, which the Court in *Monsanto* decided not to reexamine. See 465 U.S. at 761 n. 7, 104 S.Ct. at 1469–70 n. 7. Professor Areeda points out that after *Monsanto* "no agreement is formed when a dealer unwillingly complies solely because he wishes to avoid termination." 7 Areeda, *supra*, ¶ 1451e, at p. 128. This is just *Colgate* again; the motives for the dealer's adhering to a suggested list price are irrelevant. If (but only if) he *agrees* to adhere (having been asked to), there is an agreement, no matter how unwilling he is; but it does not follow that his agreement to adhere can never be implicit, or signified by conduct in lieu of promissory language.

Vermont Castings' list of suggested prices stated that the dealer was not being asked to agree to adhere to them, and was free to depart from them; so if Isaksen did adhere, clearly it was not because he had agreed to do so, whether implicitly or explicitly, on the basis of a solicitation in the price list—there was no solicitation. Any agreement came later, when Vermont Castings told Isaksen, "Raise your prices or else," and Isaksen raised his prices only because he feared that otherwise Vermont Castings would wreck his business by mixing up his orders. It is as if Vermont Castings had told Isaksen that it would reduce its wholesale price to him if he raised his retail price, and Isaksen had accepted the offer by raising his price.

 Although we think the district judge erred in granting judgment for Vermont Castings notwithstanding the verdict, we agree that the damages are grossly excessive. Unlike the usual dealer antitrust case, Isaksen was not terminated, so he can claim damages only from (1) the harassment that supposedly induced him to agree to raise his prices or punished him for having been slow to honor the agreement, and (2) any profits, not due to free riding, that he lost during the months when (against his better business judgment) he raised the prices he was charging for Ver-

mont Castings stoves, as he had agreed—we are assuming—to do. The second point requires elaboration. Although Isaksen may well have suffered losses during the period of Vermont Castings' unlawful activity, he made no effort to establish how much of the loss was due to that activity as distinct from unrelated business factors. The most important such factor was the diminished demand for woodburning stoves. Not only had the market for such stoves become saturated, but oil prices had begun to fall, making wood a less attractive fuel for heating, relative to oil, than it had been before. All Isaksen did to prove damages was to compare his average profits for several years before and several years during the period of unlawful activity. *Post hoc ergo propter hoc* is not a valid methodology of damage calculation, especially when it is apparent that other causal factors are at work.

 A further wrinkle is that if Isaksen's profits before he knuckled under to Vermont Castings' pressure were due in part to his taking a free ride on other dealers, who provided valuable point-of-sale services that he did not provide, he could not use those profits as his benchmark in calculating the loss of profits that was caused by his raising his prices later under pressure from Vermont Castings. The prevention of free riding is not, as yet anyway, a defense to a charge of resale price maintenance; but neither is being prevented from taking a free ride on another dealer's efforts a form of antitrust injury compensable by a damage award. See *Local Beauty Supply, Inc. v. Lamaur Inc.,* 787 F.2d 1197, 1202 (7th Cir.1986); cf. *Jack Walters & Sons Corp. v. Morton Building, Inc., supra,* 737 F.2d at 709.

 The jury pulled the figure of $100,000 out of a hat in which Isaksen's expert witness had done the usual magic tricks; but as there was no evidence of how much the antitrust violation, as distinct from unrelated market forces, contributed to Isaksen's losses, or of how much of the loss was an antitrust injury as distinct from a purely private loss from being deprived of the opportunity to take a free ride on com-

peting dealers, the expert's efforts to translate his losses into a present-value figure were irrelevant. We do not allow antitrust plaintiffs or any other plaintiffs to obtain damage awards without proving what compensable damages were actually suffered as a result of the defendant's unlawful conduct. *Olympia Equipment Leasing Co. v. Western Union Telegraph Co., supra,* 797 F.2d at 382–83.

So the damage phase of the trial must be retried. The liability phase may well have to be retried as well. The judge, unfortunately, did not comply with Rule 50(c)(1) of the Federal Rules of Civil Procedure, which requires a judge when he grants judgment notwithstanding the verdict to rule at the same time on the movant's alternative motion for a new trial, so that both rulings can be reviewed in the same appeal rather than successive appeals. Vermont Castings based its motion for a new trial not only on the excessiveness of the damages and the weakness of the evidence to support the finding of liability but also on alleged errors in the instructions. The judge made no ruling on the motion (although he remarked in passing on the excessiveness of the damages), and the correctness of the instructions is not before us. On remand the judge will have to rule on the motion for a new trial. Rule 50(c)(1) is a good rule; it should be obeyed.

 We move on to the pendent claims. One is shallow; this is Isaksen's claim that Vermont Castings libeled him by omitting his name from a list of its dealers that it circulated in Isaksen's market areas. (This was also one of the alleged acts of harassment.) The objection to this claim that there can be no defamation without a statement is superficial; the list is a statement, and the omission of Isaksen from the list could make the list a statement that he is not a Vermont Castings dealer. But not every slight is a slander or libel. The courts of Wisconsin (whose law applies to the pendent claims) require a threshold determination by the trial court that the imputation "tends so to harm the reputation of another as to lower him in the estimation of the community or deter third per-

sons from associating or dealing with him." *Converters Equipment Corp. v. Condes Corp.*, 80 Wis.2d 257, 262, 258 N.W.2d 712, 715 (1977) (footnote omitted). The reference to reputation is important. Omitting Isaksen's name from a list of Vermont Castings' dealers may have prevented third persons from dealing with him, but the same thing happens when the phone company accidentally drops a subscriber from the yellow pages. More is necessary than a diminution of transactional opportunities. In a business setting the imputation, to count as defamation, must charge dishonorable, unethical, unlawful, or unprofessional conduct. See *id.* at 263, 258 N.W.2d at 715. No such meaning could possibly be teased out of the omission of Isaksen's name from a list of Vermont Castings' dealers. To imply that a person is not a dealer in Vermont Castings' free-standing woodburning stoves is not to place the commercial equivalent of the mark of Cain on him.

The other pendent claim relates to the Wisconsin Fair Dealership Law, Wis. Stat. §§ 135.01 *et seq.*, which among other things requires a franchisor—as Vermont Castings is conceded to be—to notify his franchisee in advance if the franchisor intends to do anything that will bring about a "substantial change in [the franchisee's] competitive circumstances." Wis.Stat. § 135.04; see *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240 (7th Cir.1986). Isaksen argues that the harassment to which Vermont Castings subjected him caused a substantial change in his competitive circumstances; and of course no statutory notice was given ("I plan to start harassing you in 90 days"). But as the harassment ended more than a year before this suit was filed, we agree with the district judge that the claim is barred by the statute of limitations. See Wis.Stat. § 893.93(3)(b).

As part of the alleged harassment, Vermont Castings demanded that Isaksen sign a new and less favorable dealership agreement and threatened to terminate him if he refused. Vermont Castings repeated this threat in a counterclaim. The counterclaim asks for a declaratory judgment that Vermont Castings is entitled to terminate him if he refuses to sign the new agreement, which all of Vermont Castings' other dealers in Wisconsin have signed. Isaksen argues that such a threat if carried out would be termination "without good cause," and would therefore violate the Fair Dealership Law. See Wis.Stat. § 135.-03. The district judge disagreed, ruling that if Isaksen refuses to sign the new agreement Vermont Castings can terminate him. The judge made this ruling, however, after entering judgment for Vermont Castings on the antitrust count, and we think that a final determination of the issue must abide the final determination of antitrust liability. If as Isaksen contends Vermont Castings is trying to get rid of him because he won't play ball on prices, terminating him ostensibly for his refusal to enter into a new agreement could not be for "good cause"; a termination incidental to an antitrust violation would not be for good cause. Of course, just because Vermont Castings may have violated the antitrust laws (though this remains to be determined, given the motion for a new trial, which the district judge has yet to act on), it does not follow that it can never change the terms of the dealership agreement to Isaksen's disadvantage. But the judge's determination as to whether the change was independent of the violation was infected, indeed determined, by his premature conclusion that there had been no violation, so he must reconsider the issue after he resolves the antitrust issue in accordance with this opinion. Circuit Rule 36 shall not apply on remand.

REVERSED AND REMANDED, WITH DIRECTIONS.