**BI–RITE OIL COMPANY, INC., Plaintiff,**

v.

**INDIANA FARM BUREAU COOPERATIVE ASSOCIATION, INC., Decatur County Farm Bureau Cooperative Association, Inc., and Noble–Whitley Farm Bureau Cooperative Association, Inc., Defendants.**

No. IP 84–259–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 25, 1989.

**1367**

Corinne Finnerty, North Vernon, Ind., for plaintiff.

Thomas L. Davis, Indianapolis, Ind., for Indiana Farm Bureau Co-op. Ass'n, Inc.

Richard M. Hardy, Fishers, Ind., for Decatur County Farm Bureau Co-op. Ass'n, Inc.

Dean Dobbins, Greenfield, Ind., for Noble–Whitley Farm Bureau Co-op. Ass'n, Inc.

ENTRY

BARKER, District Judge.

This matter is before the court on two interrelated motions. The defendants, Indiana Farm Bureau Cooperative Association, Inc. ("IFB"), Noble–Whitley Farm Bureau Cooperative Association, Inc. ("Noble–Whitley") and Decatur County Farm Bureau Cooperative Association, Inc. ("Decatur"), each filed a motion for summary judgment on August 22, 1988. IFB filed a supporting brief on which Noble–Whitley relied completely and on which Decatur relied partially in addition to its own brief

filed. The plaintiff, Bi–Rite Oil Company, Inc. ("Bi–Rite"), filed its response and accompanying brief on October 12, 1988, to which the defendants jointly replied on October 27, 1988. The defendants also filed a joint motion to strike and an accompanying brief on August 22, 1988. The plaintiff responded on October 12, 1988, to which the defendants replied on October 27, 1988. The court will address the defendants' motion for summary judgment before it resolves the motion to strike.

I. *Background*[1]

The defendant IFB owns one of three petroleum refineries in Indiana. Petroleum products refined at the refinery, which is located in Mount Vernon, are distributed through IFB's pipeline and delivered at its three terminals in Switz City, Jolietville, and Peru, Indiana. In response to the oil shortage that was prevalent at the time, IFB also participated in the manufacture of fuels blended with alcohol. To make blended fuels, IFB first refined the gasoline and then purchased alcohol from outside suppliers, and added the alcohol to the gasoline at IFB's terminals. IFB charged a single price for the blended fuel rather than charging separately for gasoline and alcohol. Although there was no appreciable difference between the quality of the gasoline or in retail price, blended fuels were attractive to retailers who could take advantage of state and federal tax exemptions. The savings that accumulated from these tax exemptions offset the higher per gallon alcohol cost and gave retailers incentive to purchase the blended fuels.

The majority of the fuel refined by IFB, which included the blended gasoline, is used to supply farmer-members of county cooperative associations ("member co-ops"), which own IFB. Because the farmers' demand for fuel is generally seasonal, the refinery operates at a surplus at times. In 1981, to reduce its surplus, IFB began searching for outside customers to purchase excess product. Bi–Rite, which operated seven service stations throughout Indiana in Mount Vernon, Terre Haute, In-

1. The parties have set forth detailed accounts of their versions of what transpired. Because these accounts are rather lengthy, the court will merely summarize the most relevant and uncon-

troverted facts and will discuss additional relevant facts where appropriate in the court's analysis of the parties' arguments.

dianapolis, Washington, Columbus City, Greensburg and Seymour, was one such potential purchaser of IFB's surplus.

The stormy relationship between Bi–Rite and IFB began in 1982. After a few earlier discussions, on July 19, 1982, Lester Lee and Willis Huelson of Bi–Rite met with Ed Anania and Jeannette Thomas, representatives of IFB, to discuss the possible purchase of IFB's gasoline by Bi–Rite. Upon agreement of the parties that IFB would supply Bi–Rite with fuel at a discount from IFB's rack price, Bi–Rite began purchasing the majority of its blended fuels from IFB, including regular and unleaded gasoline blended with 10% alcohol. Bi–Rite had previously purchased alcohol and gasoline separately and then blended the fuels itself. After the July meeting, Bi–Rite dropped its other suppliers and transferred its alcohol allocation, or right to buy a specific amount of alcohol from a supplier, directly to IFB.

Soon after the July 19, 1982, meeting, IFB and Bi–Rite began experiencing problems. On July 27, 1982, Anania and Huelson spoke by telephone about the retail prices that Bi–Rite was charging at its Columbia City service station, after which Huelson travelled with his price sheets to Indianapolis to show Anania Bi–Rite's pump prices. The parties disagree as to what prompted this telephone conversation, what was discussed, and what prompted Huelson to travel to Indianapolis.

During the following months, meetings of the county cooperative associations that owned IFB were held. At these meetings, known as petroleum committee meetings, Bi–Rite alleges that representatives of individual member co-ops that competed with Bi–Rite complained to IFB about the discounts IFB was giving Bi–Rite and about the low retail prices Bi–Rite was charging customers. The plaintiff alleges that the defendants Noble–Whitley and Decatur were among those complaining. It also asserts that these member co-ops "demanded action" from IFB to prevent Bi–Rite from continuing to set such low prices.

On November 11, 1982, the only written contract between IFB and Bi–Rite that existed was executed.[2] Called the "Memorandum of Understanding," the contract set forth the terms of the agreement, such as price and quantities, under which the parties would deal for the next thirty days. The Memorandum of Understanding was extended by agreement of Bi–Rite and IFB to March 11, 1983. During the period that the Memorandum was in effect, Bi–Rite continued to order and receive IFB's gasoline.

In March 1983, for reasons that are disputed, Bi–Rite refused to pay for $632,000 worth of gasoline that it had ordered and accepted from IFB. Soon thereafter, IFB discontinued sales to Bi–Rite. This lawsuit resulted.

In its complaint, Bi–Rite alleges that the defendants violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and corresponding Indiana law. *See* Ind.Code §§ 24–1–2–1 *et seq.* Specifically, Bi–Rite alleges that IFB conspired with Decatur and Noble–Whitley to fix prices in the retail gasoline market in violation of 15 U.S.C. § 1 and Ind.Code §§ 24–1–2–1, 24–1–2–7. It also contends that the defendants attempted to monopolize or conspired to monopolize the sale of blended gasoline at wholesale and retail levels in Indiana in violation of 15 U.S.C. § 2 and Ind.Code §§ 24–1–2–2, 24–1–2–7. Finally, Bi–Rite maintains that the defendants conspired to compel Bi–Rite to cease doing business in violation of Ind.Code §§ 24–1–4–1 *et seq.*

The defendants move for summary judgment on all plaintiff's claims. They also move to strike expert testimony on the issue of damages. The defendants' arguments will be discussed below.

## II. *Discussion*

### A. Standard of Review.

The standards governing a motion for summary judgment are well-established. To prevail on such a motion, the moving party must demonstrate that no genuine

---

2. The plaintiff alleges that a long term contract existed between it and IFB, which was breached by IFB. For the reasons discussed in section II.B., the court finds that no long term contract existed. Therefore, no discussion of its terms or alleged breach is necessary to the resolution of the defendants' motion.

issue of material fact exists and that judgment as a matter of law should be granted in the movant's favor. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the nonmoving party must come forward with specific facts which show that a genuine issue exists. Whether a fact should be considered material is dependent upon whether the fact would, in some manner, affect the outcome of the suit. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d 202. A dispute about a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether any genuine issues of material fact exist, the alleged facts must be construed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in favor of the nonmovant. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d 202.

■ The court notes, however, that the range of permissible inferences that can be made from ambiguous evidence in an antitrust claim is limited. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (approving summary judgment in complex antitrust case involving both 15 U.S.C. § 1 and § 2). The Supreme Court in *Matsushita* held that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588, 106 S.Ct. at 1357. Thus, in order to survive a motion for summary judgment, the nonmoving party "must show that the inferences of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed the respondents." *Id.* In addition, in antitrust cases, the inference of monopolistic intent must be plausible. *Id.* at 587, 106 S.Ct. at 1356. This means that if the factual context of the plaintiff's claim is such that the respondent's claim makes no economic sense, the respondent must come forward with additional persuasive evidence than

would otherwise be necessary to defeat a summary judgment motion. *Id.* See also *Indiana Grocery Co., Inc. v. Super Valu Stores, Inc.*, 684 F.Supp. 561, 574 (S.D.Ind. 1988), *aff'd*, 864 F.2d 1409 (7th Cir.1989). With these settled principles in mind, the court will now turn to the defendants' arguments in support of their motion for summary judgment.

### B. Collateral Estoppel.

On April 5, 1983, Bi–Rite sued IFB for breach of contract and promissory estoppel in the Circuit Court of Bartholomew County, Indiana. On May 10, 1988, summary judgment was granted and final judgment was entered in favor of IFB on Bi–Rite's breach of contract claim. In its ruling, the trial court held that no long term contract was ever reached between Bi–Rite and IFB. On October 20, 1988, Bi–Rite's motion to correct errors was denied.

The defendants assert that, to the extent that Bi–Rite contends that a three-year long term contract existed in this case, the final judgment in the related state court action is binding upon this court. Couched in terms of the necessity to give full faith and credit to state court judgments, the defendants' argument raises the question of whether the doctrine of collateral estoppel, or issue preclusion, applies to prevent Bi–Rite from relitigating the issue of the existence of a long-term contract. In response, the plaintiff argues that principles of res judicata apply. It contends that because the state court does not have jurisdiction over federal antitrust claims, which is a prerequisite for application of res judicata under Indiana law, the state court judgment has no effect on the case at bar.

■ The plaintiff misperceives the thrust of the defendants' argument and mistakenly asserts that the doctrine of res judicata, or claim preclusion, applies rather than collateral estoppel. Although the two principles bear some resemblance, they are fundamentally different in their scope. Under claim preclusion, a judgment on the merits in a previous suit bars a later suit involving the same parties, which is based on the same cause of action. In contrast, the doctrine of issue preclusion applies

when some fact or question has been decided in a prior suit and the same fact or question arises in the subsequent suit. The judgment in the prior suit precludes litigation on that issue, regardless of the identity, or lack thereof, of the two causes of action if the issue was actually litigated and resolved in the prior suit and a determination of the issue was necessary to the judgment of the prior proceeding. *Bailey v. Andrews*, 811 F.2d 366, 369 (7th Cir. 1987); *see also Hockett v. Breunig*, 526 N.E.2d 995 (Ind.App.1988) (quoting *Town of Flora v. Indiana Svc. Corp.*, 222 Ind. 253, 257, 53 N.E.2d 161, 163 (1944)). In applying principles of issue preclusion, Indiana state law requires courts to determine what the first judgment decided and how the earlier decision bears on the subsequent case. *Webb v. State*, 453 N.E.2d 180, 183 (Ind.1983), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1449, 79 L.Ed.2d 767 (1984).

The court finds that issue preclusion applies. It is clear that the issue of whether a long term contract between Bi–Rite and IFB existed was actually litigated and resolved. In its summary judgment in favor of IFB, the state court found, after considering depositions, affidavits, briefs and arguments of the parties, that no long term contract was ever agreed upon by Bi–Rite and IFB. This was the only issue before the court and was the sole basis for granting summary judgment. Thus, it is clear that the determination that no contract existed was essential to the state court's finding that IFB was not liable for breach of contract.

In the case at bar, the plaintiff raises the identical issue when it alleges that a long term contract existed between Bi–Rite and IFB. The plaintiff bases its contention upon essentially the same facts as those alleged in the state court proceeding. Indeed, much of the evidence used in connection with this motion for summary judgment was also offered in the prior state court proceeding. Although alleged for different purposes and under different causes of action, the facts raise precisely the same issue, which would require exactly the same analysis. Under these circumstances, the court finds that issue preclusion is appropriate. The court, therefore, gives effect to the state court's determination that no long term contract between Bi–Rite and IFB existed.

This finding is not altered by the fact that only Bi–Rite and IFB were parties to the state court proceeding and that Decatur and Noble–Whitley are additional defendants in the case at bar. Issue preclusion may be used defensively by parties who were not litigants in an earlier suit if the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier suit. *See Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971); *Inland Oil & Transport Co. v. City of Mount Vernon*, 624 F.Supp. 122, 123 (S.D.Ind.1985); *see also Hockett*, 526 N.E.2d at 1002–03. Thus, the doctrine of issue preclusion extends to the other defendants who were not parties to the prior litigation, because Bi–Rite, the party against whom the doctrine is asserted, had a full and fair opportunity to litigate the issue in the earlier suit.

### C. Alleged Violation of 15 U.S.C. § 1.

The plaintiff alleges that the defendants engaged in a conspiracy "to fix, control, raise and stabilize arbitrarily, unlawfully, unreasonably and knowingly the price of blended gasoline, to restrain trade and interstate commerce for blended gasoline, and to preclude Bi–Rite from buying and selling blended gasoline except on terms controlled by the defendants" in violation of 15 U.S.C. § 1. The defendants contend that no such violation can be shown; therefore, summary judgment in their favor is proper.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal." 15 U.S.C. § 1. It is well settled that this provision was intended to prohibit only unreasonable restraints of trade. *Business Electronics v. Sharp Electronics*, 485 U.S. 717, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988).

To prove a section 1 violation, the plaintiffs must demonstrate that the defendants acted in a concerted fashion, rather than independently. 15 U.S.C. § 1. Unilateral conduct, regardless of any anticompetitive effect, is not proscribed by section 1. To establish the existence of concerted action, the plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the defendants had a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Svc. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (quoting *Edward J. Sweeney & Sons*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). The agreement may be implicit or signified by conduct in lieu of promissory language. *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1164 (7th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1728, 100 L.Ed.2d 193 (1988).

When an agreement to restrain trade is inferred from other conduct, and that conduct is so ambiguous that by one interpretation it is consistent with a legitimate business purpose or independent action, additional proof or evidence must be presented that tends to exclude the legitimate course of action. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471, 79 L.Ed.2d 775. An agreement cannot be inferred, however, merely from the existence of complaints, or even from the fact that termination of the manufacturer's relationship with the dealer was motivated in response to complaints. *Id.* The plaintiff must produce evidence that tends to exclude the possibility that the defendants were acting independently. *Id.*

Bi–Rite's section 1 claim is based on its contention that the defendants entered into an agreement to fix, control, or stabilize prices of blended gasoline in markets where Bi–Rite competed with member cooperative associations in restraint of trade with interstate commerce. Bi–Rite maintains that this conspiracy included a commitment by the defendants to prevent Bi–Rite from "leading the market down" in counties where it competed with member co-ops. To support its claim, Bi–Rite cites evidence that member co-ops, including Noble–Whitley and Decatur, complained to IFB at petroleum committee meetings about Bi–Rite's low retail prices and demanded action from IFB to prevent downward pressure on retail gas prices in counties where Bi–Rite competed with the member co-ops.

The defendants assert that Bi–Rite's claim is premised solely on allegations that IFB terminated its relationship with Bi–Rite in response to complaints that were made by member cooperative associations to IFB concerning their displeasure about the fact that IFB was selling gasoline to Bi–Rite at prices that were lower than members were receiving, thus giving Bi–Rite a competitive edge by allowing it to offer reduced prices to customers. The defendants vigorously argue that IFB's refusal to sell to Bi–Rite was motivated solely by Bi–Rite's nonpayment of a substantial debt to IFB for gasoline. They contend that Bi–Rite's refusal to pay for more than $632,000 worth of gasoline taken from IFB was clearly a legitimate reason for refusing to continue selling gasoline to Bi–Rite. The defendants argue that this reason—not complaints from member co-ops—prompted IFB to terminate its relationship with Bi–Rite. The fact that members complained is not indicative of any kind of anticompetitive agreement. The defendants maintain that such complaints by the member cooperatives were to be expected because Bi–Rite was purchasing gasoline for less than the members who owned IFB. Furthermore, argue the defendants, similar complaints about outside purchasers in general had been received long before Bi–Rite began buying from IFB. The defendants argue that even if evidence of the complaints is taken into consideration, this evidence is insufficient to establish a conspiracy; therefore, summary judgment is proper.

The court agrees that the defendants have set forth a plausible business reason for its termination of the plaintiff and that evidence of complaints is insufficient to establish illegal concerted action; however, it finds that the plaintiff has cited additional evidence that gives rise to a reasonable

inference that the defendants acted in concert and that tends to exclude the possibility that the defendants acted independently. Although the court recognizes the paucity of the plaintiff's evidence, it cannot say that it is insufficient to withstand summary judgment.

In addition to evidence of complaints, the plaintiff maintains that the defendants took other actions that demonstrate the existence of a conspiracy. According to the plaintiff, in July 1982, Mr. Anania instructed Ty Miller, the industrial accounts manager at IFB, to call Mr. Huelson of Bi–Rite, and tell Huelson that Bi–Rite's supply was going to be shut off. The next day Mr. Huelson spoke to Mr. Anania, who informed Mr. Huelson that Bi–Rite was "driving the market down" and that the problem involved Bi–Rite's discount at the Peru terminal. Mr. Anania indicated that whether Bi–Rite would be able to order gasoline for the next day would depend on the outcome of their discussions that day. Mr. Huelson then travelled to Indianapolis with Bi–Rite's retail price sheets to prove to Anania that Bi–Rite was not driving the market down.[3] *See* Huelson October 17, 1986, Deposition at 83–85.

The plaintiff also asserts that IFB manipulated the price of blended gasoline sold to Bi–Rite and other commercial purchasers by giving them artificial gas prices, while at the same time granting large discounts to member co-ops that had no relationship to volume or any other justifiable business reason for discounts in the petroleum industry. *See* Miller Affidavit at ¶ 18. In addition, IFB raised Bi–Rite's wholesale prices, discouraged Bi–Rite from purchasing from IFB, terminated Bi–Rite's discount and finally terminated Bi–Rite's supply. *See* Huelson October 17, 1986, Deposi-

tion at 104; Huelson May 8, 1984, Deposition at 135; Miller Affidavit.

The defendants respond by arguing that during the entire time that IFB sold gasoline to Bi–Rite, Bi–Rite purchased at a discount price. They assert that contrary to Bi–Rite's assertion of manipulation, the rack prices, rather than the discounts, were periodically adjusted. They assert that Bi–Rite's discount, which was set in November, 1982, remained unchanged until IFB cut off Bi–Rite's supply. The court notes that although no long term written contract was entered into prior to the November 1982 written agreement, the defendants do not dispute the fact that an oral agreement was reached in July 1982 to supply Bi–Rite. The actual terms of that agreement are unclear. Thus, it is possible that IFB did change the prices and discounts prior to the November agreement and that the prices were manipulated while still being below prices charged by IFB to others.[4]

Finally, the plaintiff states that concerted action is shown by activities of representatives of Noble–Whitley and Decatur. A Noble–Whitley representative followed supply trucks from the IFB terminal to Bi–Rite's gasoline service stations. Decatur representatives engaged in surveillance activities in order to determine the source of Bi–Rite's supply of blended gasoline. Also, Mr. Miller of IFB testified that he was present during discussions in which Gene Manners of Noble–Whitley complained to IFB about Bi–Rite and requested action by IFB. The plaintiff asserts that these actions support a reasonable inference that Noble–Whitley and Decatur were involved in a conspiracy with IFB to terminate Bi–Rite.

3. The parties disagree about Huelson's motivation for travelling to Indianapolis. The defendants argue that Huelson voluntarily went to Indianapolis, without prodding by Anania. They point to Huelson's deposition testimony, in which he states that no one demanded that he go to Indianapolis. *See* Huelson Deposition at 83–85. On the other hand, the plaintiff maintains that Huelson felt that he *had* to go to Indianapolis to prevent a supply shut-off because Anania apparently conditioned his decision about providing gasoline to Bi–Rite on Hu-

elson's ability to prove that Bi–Rite was not driving the market down.

4. Bi–Rite also points out that IFB sold Bi–Rite misblended gasoline, which caused Bi–Rite to sustain substantial adverse tax consequences. IFB readily admits that it sold the misblended gasoline to Bi–Rite; however, it also states that IFB immediately offered to reimburse Bi–Rite for incurred expenses, which Bi–Rite refused. Thus, the defendants argue and the court agrees that this incident does not appear to be relevant to the plaintiff's antitrust claims.

The court finds that the plaintiff's evidence, if believed would tend to negate the plausibility of the defendants' explanation for their actions. Although nonpayment of debt is a legitimate reason for terminating a commercial relationship, it could reasonably be construed as inconsistent with the behavior of the defendants prior to termination. The inconsistent behavior might lead to the conclusion that the defendants acted with a conscious commitment to terminate Bi–Rite. The court, therefore, finds that the plaintiff has presented evidence sufficient to raise a genuine issue of material fact as to whether an agreement existed. However, the inquiry does not end here. In order to successfully prove that the defendants violated section 1, the plaintiff must show that the alleged restraint is unreasonable.

■■■■ As a general rule, the determination of whether a particular concerted activity violates section 1 is made through a case-by-case application of the "rule of reason." The rule of reason analysis requires the factfinder to weigh all the circumstances of a case when deciding "whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Business Electronics*, 108 S.Ct. at 1519 (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977)). On the other hand, certain categories of agreements, which involve conduct that is plainly anticompetitive, have been held to be *per se* illegal, thus dispensing with the need to apply the "rule of reason" analysis. *Id.* Conduct is plainly anticompetitive if it "would always or almost always tend to restrict competition and decrease output." *Id.* (citing *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289–290, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985)). *See also National Collegiate Athletic Assn. v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 103–104, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984) (*"Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged con-

duct"). Once a plaintiff establishes that such an agreement caused him to be injured, he need prove nothing more to recover for that injury. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). The court notes, however, that there is a presumption in favor of application of the rule of reason standard. A departure from the standard in favor of the *per se* rule must be justified by demonstrable economic effect. *Business Electronics*, 108 S.Ct. at 1520.

■■■■ In *Business Electronics*, Sharp, the manufacturer, terminated its dealer relationship with Business Electronics after Sharp received complaints and threats from another dealer based on Business Electronics' low prices. In its discussion of Business Electronics' antitrust claims, the Supreme Court noted that the purpose of the *per se* rule in the context of vertical restraints is extremely limited and acknowledged the difficulty that manufacturers have in avoiding *per se* liability for "legitimate and competitively useful conduct." *Id.* at 1521. After discussing the limited scope of the *per se* rule, the Supreme Court concluded that "a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." *Id.* at 1525. Because the evidence failed to reveal a price agreement between the manufacturer and the complaining dealer, the court held that the *per se* rule did not apply. *Id.*

The plaintiff asserts that a *per se* analysis is appropriate in this case because the unlawful agreement involved vertical price restraints. In response, the defendants do not dispute that the alleged agreement would be considered a vertical agreement; however, they argue that IFB never fixed, set, controlled or even suggested retail prices to any gasoline purchaser. Thus, contend the defendants, the *per se* rule is inapplicable and the rule of reason approach should be employed by the court to determine the reasonableness of the alleged restraints.

In support of its assertion that the *per se* rule applies, the plaintiff acknowledges

that IFB did not suggest any specific retail prices for gasoline to either Bi–Rite or other member co-ops and that none of the defendants admits that they agreed to set prices at a specific level. However, the plaintiff asserts that circumstantial evidence tends to show that an agreement "to stabilize" prices was reached between IFB and the member co-ops.

First, the plaintiff maintains that IFB tried to force Bi–Rite to stabilize its prices at the retail level. The plaintiff asserts that IFB's efforts to prevent Bi–Rite from "leading the market down" in counties where Bi–Rite competed with member co-ops, as shown by Anania's July 27, 1982, conversation with Huelson, demonstrates IFB's attempts to control Bi–Rite's retail prices. IFB's actions caused Bi–Rite to change its position in the market from a price leader or discounter to a market follower. This means that Bi–Rite waited for price changes to "take hold" in a retail market before it changed its own prices.

Second, the plaintiff contends that the evidence before the court gives rise to an inference that the defendants' intent was to stabilize prices for blended gasoline in order to assist member cooperative associations to more effectively compete with other retail gasoline companies such as Bi–Rite. Finally, the plaintiff asserts that a concern that was present in *Business Electronics* is absent here. In *Business Electronics*, the Supreme Court recognized that manufacturers who terminate price cutters are "often motivated by a legitimate desire to have dealers to provide services, combined with the reality that price cutting is frequently made possible by 'free riding' on the services provided by other dealers." *Id.* at 1523. The plaintiff states that while the parties dispute the reason for IFB's termination of Bi–Rite, no one asserts that Bi–Rite was terminated because IFB was motivated by a legitimate desire to have Bi–Rite provide some sort of services to ultimate consumers. Thus, argues the plaintiff, the policy considerations underlying the court's decision in *Business Electronics* are not applicable.

Despite the plaintiff's attempts to distinguish the present facts from those in *Business Electronics* and to cite evidence tending to show the existence of an agreement on price, the court finds that the evidence fails to give rise to a reasonable inference that the defendants agreed among themselves to set, fix, or stabilize prices or price levels. Although the evidence concerning the July 27, 1982, conversation is somewhat troublesome, it does not show that IFB demanded that Bi–Rite charge a certain price or that IFB even suggested a certain price to Bi–Rite and it certainly does not reflect any agreement between IFB and the other defendants. Also, although the plaintiff asserts that the evidence gives rise to an inference that Noble–Whitley and Decatur agreed with IFB to stabilize prices, the plaintiff does not give any indication as to which evidence might lead to that conclusion. The court assumes that Bi–Rite refers to the alleged complaints that were made. While such evidence may reveal some dissatisfaction with Bi–Rite's prices, dissatisfaction in the inconsistent prices charged by IFB, or a motive to get rid of Bi–Rite, it, alone, is not indicative of an additional agreement to set prices. Even if the court assumes that the member co-ops' individual motivation for complaining was to stabilize prices, there is no evidence that they explicitly or even implicitly agreed among themselves to set prices at a specific level. Furthermore, it does not necessarily follow that a vertical price agreement underlies an agreement to terminate a price cutter. *See Business Electronics*, 108 S.Ct. at 1523. Thus, without more evidence linking the defendants' behavior to an agreement on prices, an inference that such an agreement existed cannot reasonably be made.

 The plaintiffs' additional assertion that the defendants engaged in retail price maintenance activities is equally unavailing. Resale price maintenance is a form of price fixing. Resale price maintenance is established when a price is announced and some course of action is undertaken or threatened by the supplier if the retailer does not adopt the price. *See Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158 (7th Cir.1987); *see also Butera v. Sun Oil Co. Inc.*, 496 F.2d 434 (1st Cir. 1974) (gasoline supplier who suggested re-

tail prices to retail gasoline station owner did not violate section 1 because the supplier did not take any action or threaten any action contingent on the retailer's adherence to the suggested price). The action need not amount to coercion; however, it must involve making a meaningful event depend upon compliance or noncompliance with the suggested retail price. *Id.*

■ As previously noted, it is undisputed that IFB did not set or suggest retail prices to its purchasers. Although the July 23, 1982, conversation between Anania and Huelson may give rise to an inference that Bi–Rite felt pressured to be less competitive, it is not sufficient to reasonably lead to the conclusion that IFB set a price and threatened action contingent on Bi–Rite's adherence to that suggested price. The evidence does not suggest that IFB required adherence by any purchaser to a certain price as a condition for receiving a discount. Moreover, the plaintiff does not show a relation between any suggested prices and evidence that IFB announced that Bi–Rite's discount would be revoked effective November 1, 1982, which the plaintiff asserts is evidence of a resale price maintenance. Thus, the court finds that there is insufficient evidence to support a reasonable inference that the defendants engaged in resale price maintenance.

Because the facts do not lead to a reasonable inference that a vertical restraint involving an agreement on prices or price levels existed, the court finds that the *per se* rule does not apply. Accordingly, the court must determine whether the alleged restraints on competition are unreasonable under the rule of reason.

■ Under the rule of reason, the plaintiff must show that the effect of the defendants' conduct is to restrict competition rather than promote it. In other words, the plaintiff must show that the challenged restraint has an adverse impact on competition in a relevant market. *Monsanto*, 465 U.S. 752, 762, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). Thus, under the rule of reason, even if the plaintiff is able to prove the existence of a conspiracy, the plaintiff would still have to demonstrate an anticompetitive effect in the relevant geographic and product market.

*Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 539 (7th Cir.1986). This requires the court to determine the relevant market and the defendants' role in that market. *Ball Memorial Hospital, Inc. v. Mutual Hospital Ins. Co.*, 784 F.2d 1325, 1334–37 (7th Cir.1986). The defendants must possess market power in order to have a real adverse effect on competition. *Id.*

■ In its complaint, the plaintiff defines the relevant product market generally as petroleum products sold at the retail service station level, including unleaded gasoline, regular gasoline, and blended gasoline. It also asserts that the relevant geographic market is essentially local, due to the nature of the gasoline service station industry, the purchasing patterns of gasoline purchasers, and the costs associated with operating a gasoline service station.

In their motion for summary judgment, the defendants do not dispute the plaintiff's definition of the relevant product market; however, they further define the geographic market as the petroleum market of Indiana. They maintain that their market power was so small that they could not have had an anticompetitive effect on the market. As evidence of their inability to control the market the defendants state that in 1982 and 1983, IFB was one of five petroleum industries in the state of Indiana. The capacity of IFB's refinery was extremely small when compared to the other Indiana refineries. Its output consisted of less than five percent of the total refinery capacity in Indiana during the period Bi–Rite and IFB did business together. For example, in 1983, the total refinery capacity in Indiana was 466,000 barrels per day. Of this total, IFB's refinery accounted for only 21,670 barrels. In addition, Decatur sold approximately 107 gallons of gasoline per day during the period of July 19, 1982, through March 31, 1983, compared to Bi–Rite's sales of almost 2,686 gallons per day for the same period.

In its brief in response to the defendants' motion, the plaintiff relies wholly on a *per se* analysis to avoid summary judgment, catagorically stating that the rule of reason

is inapplicable. Thus, the plaintiff has cited no evidence to dispute the defendants figures to define the relevant market or demonstrate the anticompetitive effects of the defendants' conduct on the market.

The court finds that the defendants' evidence tends to show that they had little market power. Although the court recognizes that market share is only one factor in determining market policy, *Ball Memorial Hospital Inc.*, 784 F.2d at 1336, these facts tend to show that the defendants did not have the ability to control output and prices in the relevant market, and thus did not have the market power to adversely effect competition.

The court also finds that the plaintiff has not met its burden to set forth facts that contradict the facts set out by the defendants. Thus, the court finds the plaintiff has failed to show that there are disputed facts on the question of whether competition in a specified market has been restrained. Despite the fact that there is a genuine issue of material fact concerning the existence of an agreement, the court finds that summary judgment is appropriate because the plaintiff has not shown that a genuine issue exists with regard to the reasonableness of the alleged restraint on competition, an essential element of its antitrust claim. Accordingly, summary judgment on the plaintiff's claim for violations of 15 U.S.C. § 1 against all the defendants is GRANTED.

D. Alleged Violations of 15 U.S.C. § 2.

1. *Attempted Monopoly.* In their motion for summary judgment, the defendants argue that Bi–Rite cannot show that the defendants attempted to monopolize the retail or wholesale blended fuels market in violation of 15 U.S.C. § 2 and Ind. Code 24-1-2-2, 24-1-2-7. In its response to the defendants' motions, the plaintiff fails to cite any evidence in support of its claim. Indeed, the plaintiff fails to even address the issue of whether the defendants were engaged in an attempted monopoly. The court assumes that the plaintiff has abandoned its attempted monopolization allegations and now relies solely on a conspiracy theory to show that the defen-

dants violated 15 U.S.C. § 2. The court will proceed accordingly.

2. *Conspiracy to Monopolize.* A claim for conspiracy to monopolize in violation of 15 U.S.C. § 2 requires proof of the following four elements: "1) the existence of a combination or conspiracy; 2) overt acts in furtherance of the conspiracy; 3) an effect upon a substantial amount of interstate commerce; and 4) existence of a specific intent to monopolize." *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 540–41 (7th Cir.1986).

In support of their motions, the defendants argue that Bi–Rite cannot show that any of the four elements set out above exists. Specifically, the defendants first contend that there is no evidence that any defendant had a specific intent to monopolize any market or affect a substantial amount of interstate commerce. Second, they assert that no evidence exists that tends to show any agreement or overt acts committed by any defendant in furtherance of an agreement. Finally, the defendants maintain that "it is crystal clear, whether Bi–Rite wants this court to consider it or not, that no defendant controlled any significant percentage of any market nor had the ability, even in its wildest dreams, to monopolize any such market or affect a substantial amount of interstate commerce." *See* Defendants' Reply Brief at 8.

Addressing the elements of specific intent first, the court notes that evidence of an intention to exclude competition and expand one's own business does not sufficiently prove a specific intent to monopolize. *Great Escape*, 791 F.2d at 541. In *Great Escape*, the court explained:

> The very nature of unfettered competition is exclusionary to the extent that making a sale and increasing an available share of business is its object. Were all that were required by the specific intent requirement an intent to prevail generally in the market, the very competitive behavior that the antitrust laws were intended to protect would instead be prohibited.

*Id.* (quoting *General Communications Engineering, Inc. v. Motorola Communi-*

*cations & Electronics, Inc.,* 421 F.Supp. 274, 286 (N.D.Cal.1976)). Thus, in order to show specific intent, the plaintiff must show more than intent to injure competitors. The plaintiff must demonstrate that the defendants intended to control prices or to restrain competition unreasonably. *See G. Heileman Brewing Co. v. Anheuser-Busch, Inc.,* 676 F.Supp. 1436, 1473 (E.D. Wis.1987), *aff'd,* 873 F.2d 985 (7th Cir. 1989); *see also Indiana Grocery Co. v. Super Valu Stores, Inc.,* 684 F.Supp. 561, 568 (S.D.Ind.1988), *aff'd,* 864 F.2d 1409 (7th Cir.1989). Specific intent may be inferred from predatory conduct which is broadly defined as "conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition." *Great Escape,* 791 F.2d at 541.

The plaintiff asserts that specific intent to monopolize is established by inference from predatory conduct. Bi–Rite argues that because it has set forth evidence of a section 1 violation, the predatory conduct/specific intent element is satisfied. This assertion is unavailing, however, because, as discussed above, the court has found that no genuine issue of material fact exists as to the plaintiff's section 1 claim. Although the plaintiff does not argue that predatory conduct is established by action having no legitimate business purpose, it does set out in its complaint behavior on the part of the defendants to demonstrate conspiratorial intent. However, a review of the evidence reveals that no reasonable inference of specific intent by virtue of predatory conduct may be found.

First, the plaintiff states that IFB caused Bi–Rite to lose its relationship with all previous wholesale suppliers of gasoline. Although the purpose for which Bi–Rite terminated its relationship with other suppliers was to do business with IFB, it cannot be reasonably inferred that IFB forced Bi–Rite to terminate its other suppliers or that IFB had an illegitimate business reason for selling gasoline to Bi–Rite. Furthermore, Bi–Rite resumed its relationships with other suppliers after it was cut off by IFB for failure to pay. Although Bi–Rite may not have received prices as favorable as it had before doing business with IFB, it was still able to purchase gasoline.

Second, the plaintiff asserts that IFB refused to sell gasoline in breach of contract with Bi–Rite. As stated earlier, the court finds that no long term contract existed. With regard to the Memorandum of Understanding, IFB continued sales under its terms until Bi–Rite stopped payment. In addition, IFB has offered a plausible reason for terminating Bi–Rite, *i.e.,* refusal to pay for more than $632,000 worth of gasoline received. This is certainly a legitimate business purpose for refusal to sell.

Third, the plaintiff asserts that the defendants engaged in surveillance activities relating to the delivery of gasoline supplies and that IFB printed false business cards and sent an employee to Michigan to seek information about the retail market in Michigan. Although these activities could reasonably be viewed as suspect, it cannot reasonably be inferred that the only purpose was to destroy or damage competition. Even if the only purpose was anticompetitive, the court finds that this evidence alone is insignificant.

Fourth, the plaintiff asserts that IFB directed an employee to obtain information about Bi–Rite's retail sales, Bi–Rite's maintenance of business records, and its confidential financial information. The court finds no evidence of this in the record. Nevertheless, IFB does not appear to deny such activity, but explains that this conduct was motivated by a legitimate concern for Bi–Rite's financial health.

Finally, Bi–Rite asserts that IFB filed a spurious lawsuit in which IFB alleged that Bi–Rite was insolvent. IFB maintains that the legitimacy of this conduct was established when Bi–Rite sought bankruptcy when faced with a state court judgment in favor of IFB. In the bankruptcy proceeding, Bi–Rite allegedly listed over $1,500,000 in liabilities and only $800,-000 in assets. In its response to the defendants' motion, the plaintiff did not set forth any evidence of a "spurious" lawsuit nor have the defendants set forth evidence of

the bankruptcy proceedings. However, even taking these facts as given, the court finds that they do not demonstrate predatory conduct.

Thus, for the reasons stated above, the court finds that the plaintiff has not sufficiently demonstrated that the defendants' conduct was without legitimate business justification other than to destroy or damage competition. Because no such conduct was shown and no independent antitrust violation exists, the court finds that specific intent may not reasonably be inferred from predatory conduct. Furthermore, there is no direct evidence of specific intent. Without direct or circumstantial evidence to support the plaintiff's claim, the court finds that the element of specific intent is absent. Because this necessary element is missing, it is unnecessary for the court to determine whether a genuine issue of material fact exists as to the other elements of a section 2 claim. In conclusion, the court finds that the plaintiff's section 2 claim fails and summary judgment is appropriate.

Accordingly, summary judgment on the plaintiff's claim under 15 U.S.C. § 2 is hereby GRANTED.

E. State Law Claims.

The court further finds that summary judgment is appropriate with regard to the plaintiff's state law claims under Ind.Code §§ 24–1–2–1, 24–1–2–2, and 24–1–2–7. Because Indiana antitrust law, specifically section 24–1–2–1, was substantially patterned after the federal Sherman Antitrust Act and references to decisional law under the Sherman Act may be made in construing Indiana antitrust provisions, the analysis of the plaintiff's claim under federal law is equally applicable to its state claim. *See, e.g., Beermart Inc. v. Stroh Brewery Co.,* 633 F.Supp. 1089, 1105 (N.D. Ind.), *rev'd on other grounds,* 804 F.2d 409 (7th Cir.1986); *see also Perry v. Hartz Mountain Corp.,* 537 F.Supp. 1387, 1390 (S.D.Ind.1982). Therefore, for the reasons set out in sections B and C, above, the court finds that summary judgment on the plaintiff's claim under sections 24–1–2–1, 24–1–2–2, and 24–1–2–7 is GRANTED.

In addition, the plaintiff has alleged that defendants' acts were part of a conspiracy to compel Bi–Rite to cease business in violation of Ind.Code § 24–1–4–1, which provides in pertinent part:

[A]ll arrangements, agreements, trusts, or combinations, or any agreement or arrangements that are made whereby a party or corporation refuses to furnish any article or articles required to be used in the manufacturer of any article or merchandise when the party or corporation can furnish the same, or by charging more than the regular and ordinary price for the same or doing or refusing to do any act or acts that would cause such party to cease to manufacture such article or hinder such person or corporation from so doing, and all arrangements, contracts, or acts done or performed between any person or corporation made for the purpose of compelling any person or corporation engaged in the business of manufacturing any article of merchandise to cease manufacturing any such article, or compelling the same to close down or go out of business are hereby declared to be against public policy, unlawful, and void.

The defendants move for summary judgment on the ground that no agreement or violation has occurred. In its response, the plaintiff essentially ignores the defendants' argument that there is no evidence of any violation of this statute and leaves to the court the task of wading through the evidence to determine whether a genuine issue of material fact exits.

The court finds that the plaintiff has not demonstrated that a genuine issue of material fact exists. The court initially finds that the plaintiff does not appear to fall within the ambit of terms of the statute, which refers only to manufacturers as the targets of the unlawful arrangements described above. Bi–Rite clearly was not in the business of manufacturing gasoline products, although it did blend gasoline prior to purchasing pre-blended gasoline from IFB. Furthermore, even assuming that the statute applies to Bi–Rite and that its assertions that IFB terminated Bi–Rite to appease the member co-ops or even to

control prices (of which the court has found no evidence), the court can find no evidence that leads to a reasonable inference that IFB acted with the purpose of compelling Bi–Rite to go out of business completely. Also, there is no evidence that Decatur or Noble–Whitley engaged in conduct in violation of the statute. Accordingly, the court finds that summary judgment is proper and is, therefore, GRANTED.

F. Motion to Strike.

Because the court finds that summary judgment in favor of the defendants is appropriate with regard to each of the plaintiff's claims, the defendants' joint motion to strike expert testimony on the issue of damages is moot. Therefore, it is unnecessary for the court to address the motion.

### III. *Conclusion*

The court finds that collateral estoppel applies to bar the plaintiff's factual assertion that a long term three year contract existed between Bi–Rite and IFB. The court also finds that no genuine issue of material fact exist as the plaintiffs claims that the defendants violated 15 U.S.C. §§ 1, 2 and Ind.Code §§ 24–1–2–1, 24–1–2–2, and 24–1–2–7 and § 24–1–4–1. Therefore, summary judgment is hereby GRANTED in favor of the defendants with regard to each of the plaintiff's claims. In addition, the court finds that the defendants' motion to strike is moot.

It is so ORDERED.