**The GREAT ESCAPE, INC.,**
**Plaintiff-Appellant,**

v.

**UNION CITY BODY COMPANY, INC.,**
**et al., Defendants-Appellees.**

**No. 84–3108.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1985.
Decided May 21, 1986.

Michael J. Dennis, Washington, D.C., for plaintiff-appellant.

Philip A. Whistler, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for defendants-appellees.

Before CUDAHY and RIPPLE, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUDAHY, Circuit Judge.

This is an appeal of an antitrust suit brought by a travel agency based on the loss of its principal customer to another agency. The district court for the Southern District of Indiana granted the defendants' motion for summary judgment. We affirm.

## I.

The plaintiff, The Great Escape, Inc. ("Great Escape"), brought an antitrust action against the defendants, Union City Body Company ("UCBC"), C & J Commercial Driveaway ("C & J"), Miami Valley Auto Club, Inc., doing business as World Wide Travel ("World Wide"), and William L. Adelsperger. Great Escape and World Wide are travel agencies operating in the Union City, Indiana, area. UCBC manufactures truck bodies in Union City, principally for General Motors ("G.M."). Adelsperger is the President and Chief Executive Officer of UCBC. He also serves as a member of the Advisory Board of the Darke County, Ohio Division of the Miami Auto Club.

He is not compensated for sitting on this Board. C & J is a delivery service that delivers vehicles from their place of manufacture.

G.M. delivers truck chassis to the UCBC plant, where the truck bodies manufactured by UCBC are installed onto the chassis. G.M. is then responsible for delivering the completed truck from the UCBC plant to its dealers. Since 1974 G.M. has hired C & J exclusively to deliver the completed G.M. trucks. Between 1980 and 1983, G.M. and its subsidiaries accounted for approximately ninety-three percent of C & J's business. C & J also makes some deliveries for UCBC directly of trucks sold under UCBC's own name. The district court found that UCBC orders comprise about seven percent of C & J's business.

C & J delivers the completed trucks by either the "truckaway" or the "driveaway" method. In a "truckaway," the vehicle to be delivered is loaded on a flatbed truck, driven to its destination and unloaded, and then the truck is driven back to Union City. In a "driveaway," the vehicle is driven, either alone or in tandem with another vehicle connected by a tow bar, to its destination. The driver then uses an alternative means of transportation to return to Union City.

Before April 1982 the C & J drivers engaged in a "driveaway" were issued advance checks when they left Union City. They then purchased their own return airline tickets, either at the airport, or at one of three travel agencies, World Wide, Great Escape or Treaty Travel. Great Escape had an office in Union City. The other two travel agencies were located in Greenville, Ohio, which is twelve miles east of Union City. Generally the drivers did not purchase their tickets at the airport because of problems created by their tow bars, which they had to return to Union City after delivering the vehicles. The tow bars weighed 150 pounds; consequently the drivers preferred to have a ticket in hand when they reached the airport so that they could check the tow bars with porters at the airport terminal curb. Additionally, it was inconvenient to use the Greenville travel agencies because it was very difficult to park in Greenville with a tow bar on a van and another van in tandem. Thus Great Escape, which was located nearby C & J's terminal, attracted about ninety percent of the drivers' business.

In March 1982 James Mercer, C & J's Union City terminal manager, and John Leach, the manager of operations at C & J's home office in Michigan, contacted Barbara Witt, the President of Great Escape. They asked her to be the exclusive agent for airline tickets for C & J drivers. In April 1982 she accepted their offer and entered into a new arrangement with C & J. Great Escape would provide the airline tickets to the drivers and bill C & J directly each week. C & J gave Witt a $5,000 deposit. The arrangement between C & J and Great Escape was at will, without a specified duration.

Wilma Murphy, the Executive Vice President of World Wide in charge of the Greenville office, learned of the arrangement and asked Adelsperger if he knew anyone at C & J Driveaway with whom she could speak about acquiring C & J's business. Subsequently Adelsperger met with Leach and asked him to consider using World Wide's travel agency services. They twice spoke to each other by telephone concerning this topic. After the meeting with Adelsperger, Leach met with Murphy at World Wide. Subsequently there were several other communications, by letter and telephone, between Leach and Murphy. Murphy promised that if C & J used World Wide, several services would be provided, including computerized reservations and ticketing, a guarantee of the lowest available airfare, a $100,000 travel insurance policy for each driver at no additional cost, cashing advance checks and arranging for cabs to pick up returning drivers at the airport. World Wide did not have an office in Union City, but promised either to deliver the tickets to C & J by courier or to prepay the tickets so that the drivers could pick up the tickets at the airport.

There was some testimony that C & J initially found World Wide's offer unacceptable because it thought that delivery by courier involved a security risk and a time lag, and prepaid tickets would present the drivers with the tow-bar problem. Leach, however, eventually decided to accept World Wide's offer to provide prepaid tickets. Warner Canto, President of C & J, approved the switch, which went into effect on November 29, 1982. Ten days after accepting the offer of prepaid tickets, on November 22, 1982, C & J accepted courier delivery from World Wide instead. C & J changed its mind after being informed that airline regulations prohibited World Wide from absorbing prepaid ticket charges. C & J's arrangement with World Wide is at will, for no specific duration.

Before World Wide actually began to sell tickets to C & J, however, World Wide decided to open a branch office in Union City, just across the street from the C & J terminal. The Union City branch office opened in April 1983. World Wide opened this branch office for less than $5,000. Great Escape's predecessor had opened its travel agency business in Union City for less than $8,000.

Shortly before the switch, E.J. Sobie, Leach's superior, wrote an internal memorandum disagreeing with the switch. The memo stated: "I do not accept the need for change just because of political pressure."

Great Escape filed a five count complaint in March 1983. The first two counts allege violations of the federal antitrust laws. Plaintiff alleged that the defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by 1) unreasonably restraining interstate commerce through a combination, contract or conspiracy; 2) tying the purchase of vehicle delivery services from C & J to C & J's purchase of services from World Wide; and 3) engaging in a concerted refusal to deal and a group boycott in an attempt to drive Great Escape out of business.[1] Plaintiff alleged that the defend-

ants violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by 1) combining and conspiring to monopolize interstate trade and commerce; and 2) attempting to monopolize interstate trade and commerce. Great Escape also alleged that the defendants "made, and continue to make, leases, sales, contracts for sale, conditions, agreements and understandings, the effect of which may be to substantially lessen competition or tend to create a monopoly in said interstate trade and commerce," in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14. Count III alleged violations of the Indiana state antitrust law. Ind.Code § 24-1-1-1 *et seq.* Count IV alleged intentional interference with Great Escape's contracts and prospective business relations. Count V alleged a violation of the Indiana common law of unfair competition. The Clayton Act and the unfair competition claims were dropped by plaintiff before summary judgment was granted. Great Escape does not appeal the dismissal of the intentional interference with contracts claim.

## II.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States...." 15 U.S.C. § 1. Although summary judgment is ordinarily inappropriate in antitrust cases, it is available when "there is an absence of any significant probative evidence tending to support the complaint." *O'Byrne v. Cheker Oil Co.,* 727 F.2d 159, 163 (7th Cir.1984); *see Products Liability Insurance Agency v. Crum & Forster Insurance Companies,* 682 F.2d 660, 663 (7th Cir.1982). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* —— U.S. ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

---

**1.** This allegation was raised in a Supplement to Plaintiff's Statement of Contentions of Law,

filed April 26, 1984.

The non-moving party must produce specific facts showing that there is a genuine issue for trial. *Id.* "[A] plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* Here, as in *Checker,* "the facts upon which plaintiffs rely to support their Sherman Act conspiracy allegations are not susceptible of the interpretation they seek to give them" and the "plaintiffs had ample time to substantiate their claims of conspiracy but were unable to do so." 727 F.2d at 163.

■ Plaintiff alleged that UCBC and Adelsperger forced C & J to switch its patronage in order to keep UCBC's delivery business, thus creating a coercive reciprocal dealing agreement. Alternatively, plaintiff argues that C & J switched travel agencies in return for Adelsperger's agreement that UCBC would maintain good relations with C & J. A coercive reciprocal dealing agreement is similar to a tying arrangement. It exists when a buyer (UCBC) conditions its purchases on an agreement or contract that the seller (C & J) will make reciprocal purchases from it. There must be an actual agreement between or among the defendants and the buyer must have substantial market power tending to require the seller to make the reciprocal purchase. Mere unilateral conduct, such as buying from a present customer in order to give that customer an incentive to keep buying from it, or in order to maintain "good-will," is not a violation of the Sherman Act, even though it may involve some degree of reciprocity. *See United States v. General Dynamics Corp.,* 258 F.Supp. 36, 66 (S.D.N.Y.1966); Kintner, Federal Antitrust Law 265, 274 (1980); Sullivan, Antitrust 493 (1977). Market power is generally deemed to be a necessary element of the transaction because without it there would appear to be no adverse effect on competition. Sullivan, at 491–92; *see also Will v. Comprehensive*

*Accounting Corp.,* 776 F.2d 665 (7th Cir. 1985) (market power required for a tying arrangement to violate section 1); *cf. United States v. General Dynamics Corp.,* 258 F.Supp at 57–58, 66 (suggesting that "mutual patronage" or non-coercive reciprocity is within the ambit of the antitrust laws).

■ Preliminarily we note that if this were a coercive reciprocal dealing agreement cast in the traditional form, UCBC would be forcing C & J to make a purchase from it, rather than from the entirely independent World Wide. Although there are suggestions that Adelsperger might benefit in some way if C & J switched travel agencies,[2] it seems less likely for this situation to result in a Sherman Act violation than if UCBC were to directly benefit. *Cf. Carl Sandburg Village Condominium Association No. 1 v. First Condominium Development Co.,* 758 F.2d 203, 207–08 (7th Cir.1985) (no illegal tying arrangement when the alleged tying company has absolutely no economic interest, such as commission or rebate, in the sales of the tied seller, whose products are favored by the tie-in). Additionally, we question whether an agreement to maintain good relations, without more, can violate the antitrust laws. Plaintiff has cited no authority on this issue. Defendants argue that if an agreement to maintain good relations violates the antitrust laws, then every contract of sale is an antitrust violation "because every seller presumably 'ties' its 'good relations' to the buyer's agreement to buy, and conversely, implicitly threatens to 'withhold' its 'good relations' if the buyer does not buy." We need not pursue these issues further, however, because the district court correctly held that there is no direct or circumstantial evidence of the requisite agreement between UCBC and C & J and that UCBC did not have sufficient market power to require C & J to buy travel services from World Wide.

First, UCBC did not possess enough market power in the tying product (the pur-

---

**2.** Apparently World Wide opened a non-interest bearing checking account at Farmers State Bank and agreed to lease office space from UCBC after obtaining C & J's business. Great Escape had declined to bank at Farmers State Bank or to lease space from UCBC.

chase of services from C & J) to force the tied product (World Wide's travel agency services) on C & J. It is unclear exactly what percent of C & J's business consisted of sales to UCBC. Great Escape contends that seven percent of C & J's sales were attributable to UCBC. Defendants claim that the undisputed evidence shows that C & J obtained less than one percent of its business from UCBC. The parties agree that G.M. purchases constituted at least ninety-three percent of C & J's business. We agree with the district court that even if UCBC comprised seven percent of C & J's business, this would not create adequate market power in UCBC to create leverage on C & J to switch travel agencies.

Second, there is simply no evidence that Adelsperger, or anyone else, threatened C & J with a loss of business if C & J did not use World Wide's services. Great Escape's president, Barbara Witt, admitted in her deposition that she had no information that Adelsperger had ever made such a threat. Warner Canto, C & J's president, testified that no such threat was ever made, and that he was under no apprehension of consequences if C & J did not switch travel agencies. Jim Mercer, C & J's terminal manager, also testified that no consequences of any kind were threatened.

The plaintiff cites parts of the district court's opinion that state that C & J thought that the switch might help maintain good relations with UCBC generally and that C & J had a legitimate business interest in maintaining good business relations. Great Escape argues that these observations indicate that the district court found that C & J switched travel agencies in return for Adelsperger's *agreement* that UCBC would maintain good relations with C & J. Clearly, however, the district court did not find *any* agreement. One simply cannot infer from C & J's hope that good relations would be maintained that there was an agreement to maintain good relations. As noted, a firm may act, hoping to maintain good relations by its actions, without violating the antitrust laws.

■ Plaintiff also argues that the district court should have inferred a coercive reciprocal dealing agreement because World Wide offered inferior service to that of Great Escape. The parties vehemently disagree about whether World Wide offered inferior service. Plaintiff argues that C & J's acceptance of prepaid tickets, and later of courier service—options with which C & J initially found problems—is proof that World Wide offered inferior service. Plaintiff also notes that World Wide failed to find the cheapest flight on several occasions. Defendants point out that World Wide offered several services that were not offered by Great Escape, such as computerized reservations. Additionally, they note that on the few occasions World Wide failed to find the cheapest flight it refunded the difference to C & J.

The district court correctly held that evidence of alleged deficiencies in World Wide's services after the switch is not relevant to the issue whether the switch itself was caused by a coercive reciprocal agreement. On appeal, plaintiff argues that the evidence shows that C & J, *at the time of the switch,* knew or should have known that World Wide's services were inferior, and that therefore one can infer a coercive reciprocal dealing agreement. We disagree.

C & J may well have decided that the services offered by World Wide were worth trying. There was evidence that C & J expected good service from World Wide, in part because of C & J's relationship with Adelsperger. Even if C & J knew that World Wide's services were in some ways inferior, or its prices arguably higher, on the facts shown here this would not be enough from which to infer an antitrust violation. One does not necessarily violate the antitrust laws merely by entering into an arguably unfavorable business arrangement, even if one does so at the request of another. To constitute an illegal tying arrangement there must be an exercise of market power that forces one to enter into the uneconomic arrangement. As we already noted, UCBC simply did not have

enough market power to coerce C & J and there are no facts—including the facts involving the quality of World Wide's service—from which such market power could be inferred. The only "coercion" in this case arises from C & J's own desire to maintain good relations with UCBC and Adelsperger—a desire presumably underlying one C & J manager's reference to "political pressure."

■ Plaintiff also alleges that the defendants engaged in a boycott or concerted refusal to deal and conspired to drive plaintiff out of business. We agree with the district court, for reasons already discussed, that Great Escape has failed to present any evidence of an agreement among the defendants to engage in a group boycott or concerted refusal to deal. The district court's reliance on *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241 (6th Cir.1982), is well-placed. In *Dunn & Mavis* the plaintiff, a provider of auto transport services for Chrysler Motors, was replaced with another transporter by Chrysler. Plaintiff brought an antitrust action under sections 1 and 2 of the Sherman Act alleging an agreement between the new transporter and Chrysler to terminate him, knowing that the loss of Chrysler's business would destroy plaintiff's business. The court affirmed the district court's dismissal of the complaint, holding that an "agreement promising a new dealer the old dealer's business is presumptively reasonable, and the old dealer does not have an antitrust claim unless the conduct is incident to an otherwise unlawful arrangement or an attempt to monopolize an identifiable market." *Id.* at 244. When the new transporter merely persuaded Chrysler to deal with it instead of the former transporter, the court found the necessary collective action to be lacking. *Id.* Likewise, plaintiff has failed to produce any evidence of a conspiracy to drive plaintiff out of business.

■ Plaintiff makes much of the fact that the district court analyzed the concerted refusal to deal and reciprocal buying arrangement claims under the per se rule, rather than under the rule of reason. Plaintiff is correct that such claims should not always be analyzed under the per se rule, but summary judgment would still be proper even if the rule of reason were invoked. Under the rule of reason the plaintiff must allege and prove anticompetitive effects. *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 556 (7th Cir. 1980). Thus even if the plaintiff were able to prove the existence of a conspiracy, a coercive reciprocal dealing agreement or a concerted refusal to deal, plaintiff would have to demonstrate an anticompetitive effect in the relevant geographic and product market. The district court held that the relevant product market is travel services, and the relevant geographic market is Randolph County, Indiana.[3]

■ There is no anticompetitive effect when a buyer simply terminates an at-will contract with one supplier and enters into a similar contract with another supplier. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 245 (6th Cir.1982) ("Chrysler's substitution of one auto transport company for another at its Warren plant does not limit competition in any substantial sense. A contrary decision

---

**3.** The correct market definition has been a point of contention between the parties. Plaintiff originally contended that the relevant geographic market was limited to Union City, but at oral argument in the trial court plaintiff argued that there were different markets for sellers and for buyers. Plaintiff argued that the relevant market for buyers was Union City, but the market for sellers included Union City, Greenville and Muncie. The district court held that the defendants had accepted plaintiff's definition of the market as Randolph County, but made no mention of a bifurcated market. Plaintiff now argues that the district court found that the defendants accepted a bifurcated definition of the market, and therefore defendants are stuck with such a definition. We cannot read the district court's findings in this way. The district court clearly holds, in its conclusions of law and memorandum, that the geographic market is Randolph County, and at no time mentions a bifurcated market.

would limit without reason the normal principle that a buyer is entitled to choose among various sellers who offer competing products or services."); *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir.1980) ("A loss by the plaintiff of a single contract with a single purchaser is simply not the equivalent to a deleterious effect on the market.") Great Escape contends that we should infer an anticompetitive effect from the fact that World Wide presently has eighty percent of the Union City travel business and from the fact that Great Escape may go out of business as a result of losing the C & J contract. First, we note that Union City is only part of the relevant market. Second, plaintiff's argument defies common sense. Regardless of what travel agency C & J uses, that agency will have a large percentage of the business in the relevant market. This economic fact should not and cannot prevent C & J from switching travel agencies. *See Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241 (6th Cir.1982) (loss of Chrysler's business would allegedly destroy plaintiff's business). The principle that there is no anticompetitive effect when a buyer simply terminates one at will contract and enters into another overrides any inference that might be drawn from World Wide's market share. Third, the airlines shape the market for tickets by setting prices and also by selling tickets directly to consumers, although they do not necessarily provide the full range of services that travel agencies provide. Fourth, there are no barriers to entry. The district court noted that Great Escape's predecessor opened its travel agency business in Union City for less than $8,000 dollars and World Wide opened its branch office in Union City for under $5,000.

▪ Great Escape also alleges that as a result of the switch there was a decline in the quality of service and hence damage to competition. Plaintiff does not offer any solid support for this argument either factually or legally. We agree with the defendants that this contention is mere-

ly an invitation to second-guess the business judgment of C & J as to which travel agency it prefers. Further, plaintiff's argument that Great Escape will be forced out of business and that this development will have an anticompetitive effect through loss of an option for consumers is similarly without merit. As we stated in *Products Liability Insurance Agency v. Crum & Forster Insurance Companies*, 682 F.2d 660, 663 (7th Cir.1982), "there is a sense in which eliminating even a single competitor reduces competition. But it is not the sense that is relevant in deciding whether the antitrust laws have been violated." Competition means that some may be forced out of business. The antitrust laws are not designed to guarantee every competitor tenure in the marketplace.

### III.

▪ Plaintiff also claims that the defendants violated Section 2 of the Sherman Act by conspiring to monopolize and attempting to monopolize interstate trade and commerce. Section 2 makes "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... guilty of a misdemeanor...." 15 U.S.C. § 2. For attempt to monopolize the plaintiff must prove:

"(1) specific intent to control prices or destroy competition with respect to a part of commerce, (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose, and (3) a dangerous probability of success."

*Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 430 (7th Cir.1980) (quoting *Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th Cir.1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979)). For conspiracy to monopolize the plaintiff must prove 1) the existence of a combination or conspiracy, 2) overt acts in furtherance of the conspiracy,[4] 3) an effect upon a substantial

---

**4.** Kintner does not list overt acts as a requirement.

amount of interstate commerce and 4) the existence of specific intent to monopolize. *J.T. Gibbons, Inc. v. Crawford Fitting Co.,* 704 F.2d 787 (5th Cir.1983); *Clair Olsen & Guitar City Studios, Inc. v. Progressive Music Supply, Inc.,* 703 F.2d 432 (10th Cir.1983); *Safecard Services, Inc. v. Dow Jones & Co., Inc.,* 537 F.Supp. 1137, 1144 (E.D.Va.1982), *aff'd,* 705 F.2d 445 (4th Cir.), *cert. denied,* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983); Kintner, Federal Antitrust Law 434 (1980).

▬▬▬▬ Specific intent to monopolize is an element of both offenses. Because there is no evidence of specific intent here summary judgment was properly granted on these claims. All lawful competition aims to defeat and drive out competitors. Therefore, the mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize. *See Pacific Engineering & Production Co. v. Kerr-McGee Corp.,* 551 F.2d 790, 795 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977) (specific intent cannot be inferred from conduct even though its effect was to drive defendant's only competitor out of business); *General Communications Engineering, Inc. v. Motorola Communications & Electronics, Inc.,* 421 F.Supp. 274 (N.D.Cal.1976). The court in *General Communications* explained:

> Yet, the mere intention to exclude competition is not sufficient to show a specific intent to monopolize. The very nature of unfettered competition is exclusionary to the extent that making a sale and increasing an available share of business is its object. Were all that were required by the specific intent requirement an intent to prevail generally in the market, the very competitive behavior that the antitrust laws were intended to protect would instead be prohibited.... The acts from which one can infer specific intent must be essentially predatory in nature.

421 F.Supp. at 286 (footnote omitted).

▬▬▬ Specific intent may be inferred from predatory conduct, but there is no evidence here of such conduct. Predatory conduct may be broadly defined as conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition. *See Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818 (6th Cir.1982); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). The district court correctly concluded that there was no evidence of specific intent to monopolize or of predatory conduct.

Miami Auto Club did not engage in predatory pricing or any other sort of irrational economic behavior. On the contrary, Miami Auto Club has sold airline tickets to C & J Driveaway at the same price as plaintiff had sold them, and at the same price as the other competitors in Union City; there is no dispute as to this fact, especially when considered in light of the fact that the only price which may be charged is set by the airlines. Also, Miami Auto Club has made a profit on its Union City Branch, thus negating an inference that the Union City office was set up or operated to drive plaintiff out of business, thereby allowing the Greenville, Ohio office of the Miami Auto Club to move in and monopolize the market. The conduct of which Great Escape complains, that Adelsperger asked Leach to consider buying travel services from Miami Auto Club instead of the Great Escape, was rational competitive conduct and not violative of the antitrust laws. The mere fact that Miami Auto Club wanted C & J Driveaway's business, which would obviously stand to hurt Great Escape, and the fct that Miami Auto Club approached C & J Driveaway in an effort to obtain their travel account, does not establish as a matter of law a "specific intent" to monopolize. The challenged conduct is nothing more than competition, healthy competition at that, between the two travel agencies

who were vying for C & J Driveaway's travel business.

District Court Memorandum at 52.

The plaintiff argues that we should infer specific intent from Sobie's memorandum and from the fact that C & J allegedly accepted inferior services. But even if Adelsperger used "political pressure" to get C & J to use World Wide, one cannot infer that World Wide intended to monopolize the market. And we have already adequately addressed the argument that the plaintiff offered inferior services.

## IV.

 Great Escape also makes a claim of interference with its prospective business relations under Indiana common law. Indiana's most recent pronouncement on tortious interference with a business relationship was in *Biggs v. Marsh*, 446 N.E.2d 977 (Ind.App.1983). The court there stated that in such a case "it appears to be critical that the defendant acted illegally in achieving his end." 446 N.E.2d at 983;[5] *see Spier v. Home Insurance Co.*, 404 F.2d 896, 898 (7th Cir.1968) ("it is critical that ... the defendant acted illegally in achieving his end").

Despite this unambiguous statement by the Indiana courts, plaintiff argues that mere intimidation, though not involving illegality, is sufficient. Plaintiff relies on a case decided before *Biggs* that says that the improper means essential for the tort include "violence or intimidation, defamation, injurious falsehood or other fraud,

[or] violation of the criminal law * * *." *Helvey v. O'Neill*, 153 Ind.App. 635, 647, 288 N.E.2d 553, 561 (1972) (quoting Prosser, Law of Torts 977 (3d ed. 1964)). Two things need to be said about plaintiff's reliance on this language in *Helvey*. First, in light of Indiana's later statement in *Biggs*, and our own earlier statement in *Spier*, we think that this quotation from *Helvey* must be read as consistent with the proposition that the defendant act illegally. If it were not so read, it cannot be accorded much weight. Second, there are strong indications that Prosser, the source of the *Helvey* language, had in mind illegal intimidation, not potent but lawful influences that might qualify as "intimidation" in a dictionary sense. This language, in context, reads as follows:

> Apart from this [interference resulting from an improper purpose], however, the means adopted *may be unlawful* in themselves; and violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith, all have been held to result in liability.

Prosser, Law of Torts, 925–53 (4th ed. 1971) (emphasis supplied) (footnotes omitted). We note that the means listed, with the exception of "intimidation," include only conduct that is in itself illegal. Further, Prosser lists "intimidation," disjunctively with "violence," suggesting that he had in mind the more socially disapproved and unlawful forms of undue influence.[6]

---

5. In *Biggs* the court held that a violation of the Code of Ethics of the National Association of Realtors was not illegal conduct that could provide the basis for a claim of tortious interference with a business relationship. 446 N.E.2d at 983–84.

6. Indiana law of course is determinative here. The Restatement, however, also suggests that the facts before us cannot support a claim of tortious interference with prospective business relations. First, interference with prospective relations requires that more blameworthy means be used than does the tort of interference with contractual relations. Thus, "when the means adopted is not innately wrongful ... the interference is more likely to be found to be not improper." Restatement of Torts § 766B Comment e. The Restatement defines innately wrongful means as those that are tortious themselves. Second, the Restatement requires especially egregious means to be employed when a competitor is seeking to expand its business. Thus section 768 provides:

> Competition as Proper or Improper Interference
>
> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

We think these limitations by the various authorities on the tort of interference with prospective business relations are appropriate. Competitors and their allies are not necessarily gentlemen—or even scholars. Competition may be rough and tumble and even—within reasonable bounds—involve economic factors extraneous to the main competition itself. We do not believe a searching analysis only of motive is in most instances enough to send these cases to the jury. There must still under the Indiana cases be something "illegal" about the means employed. Here the means used, no matter how viewed or how characterized, do not rise to the required level of wrongfulness. Because we agree with the district court that there is no evidence that the defendants acted illegally to interfere with Great Escape's arrangement with C & J, we affirm the grant of summary judgment for the defendants on this claim.

We therefore affirm the district court's grant of summary judgment.

SWYGERT, Senior Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's analysis that summary judgment was appropriate on the antitrust claims in this case. Although it is true that summary judgment is ordinarily inappropriate in antitrust cases, it is entirely appropriate when the plaintiff is unable to introduce evidence in support of her claims after substantial discovery. I particularly agree with the majority that there is no concrete evidence of any conspiracy or agreement among the defendants. Antitrust laws are not a general remedy for tortious conduct during the course of competition. *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir.1980).

(a) the relation concerns a matter involved in the competition between the actor and the other and
(b) the actor does not employ wrongful means and
(c) his action does not create or continue an unlawful restraint of trade and
(d) his purpose is at least in part to advance his interest in competing with the other.
(2) The fact that one is a competitor of another for the business of a third person does not

The thrust of antitrust law is to prevent restraints on competition, whereas the law of unfair competition is to impose restraints on that competition. *Id.* at 556.

Although I agree with the majority that there was no antitrust violation here, I must respectfully dissent on the state tort law claim of interference with prospective business relations by defendant Adelsperger. On that count alone, I would reverse the grant of summary judgment and remand for further factfinding.

prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.
Although Adelsperger may not be a "competitor" of Great Escape in the strictest sense, we think that his position on World Wide's advisory board gave him a legitimate interest in promoting its business and thus the general principles applicable to competitors should control.