**qad., inc., a California corporation, and Karl Lopker and Pam Lopker, individuals, Plaintiffs,**

v.

**ALN ASSOCIATES, INC., an Indiana corporation and Sally Allen, Mike Allen and Ronald Whiteford, individuals, Defendants.**

**No. 88 C 2246.**

United States District Court,
N.D. Illinois, E.D.

Jan. 22, 1991.

---

Mark A. Cantor, Kevin J. Heinl, South-field, Mich. (Jami E. Bay, Jami E. Bay & Associates, Chicago, Ill., of counsel), for plaintiffs.

Robert E. Wagner, Alan L. Barry, Mi-cheal D. Lake, Wallenstein Wagner & Hat-tis, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This action has been brought by qad., inc. and its principals Karl and Pamela Lopker (collectively for convenience "qad") against ALN Associates, Inc. and its princi-pals Sally and Mike Allen and Ronald Whiteford[1] (collectively for convenience "ALN") for various alleged breaches of contract, infringements of copyright, mis-appropriation of trade secrets, unfair com-petition (under both federal and state law) and making false representations to qad.[2]

---

1. Initially the Allens were the only ALN-affil-iated principals in this lawsuit, but Whiteford has been added as a minority ALN shareholder.

2. On May 3, 1990 this Court dismissed qad's trade-secrets claim against ALN, and on June 18, 1990 it imposed attorneys' fees and expenses against qad as a sanction under Fed.R.Civ.P.

All those claims concern a basic dispute over computer software distributed by qad and ALN and over the relationships between the competing distributors and their respective customers. Only one of qad's claims is at issue here. Count II of qad's mislabeled "cross-complaint" ("Count II") charges:

22. Defendants knew and intended that their conduct as alleged above would work a substantial, irreparable and direct injury to plaintiffs.

23. Defendants had knowledge of qad., inc.'s business relationship with Hewlett–Packard and the licensees of plaintiffs. Defendants knew these relations had the possibility of future economic benefits to plaintiffs and yet defendants have committed intentional acts to disrupt those relations, and have caused such disruption.

24. The conduct of defendants has been a proximate cause of damage to plaintiffs, and threatens to cause substantial and greater damage if such conduct is allowed to continue.

25. Defendants have acted in bad faith and with an oppressive, fraudulent and malicious intent to injure plaintiffs entitling plaintiffs to an award of punitive damages.

ALN now moves under Rule 56 for summary judgment as to Count II. For the reasons stated in this memorandum opinion and order, that motion is granted and Count II is dismissed on the merits.[3]

*Facts*[4]

qad and ALN are competitors in the computer software business. Their main dis-

---

("Rule") 11 (1990 U.S.Dist. LEXIS 7458). On July 6, 1990 this Court, again acting under Rule 11, further sanctioned qad by imposing the cost of attorneys' fees incurred by ALN in the preparation of its previous summary judgment motion—a filing that was withdrawn due to qad's then having amended its original pleading, which was itself in violation of Rule 11 (1990 U.S. Dist. LEXIS 8350). Last month the parties quantified the total of those sanctions at a $20,-000 figure. Yet as this opinion reflects, qad apparently views itself like the "I" in the William Ernest Henley's *Invictus*: Its head may be bloody, but it remains unbowed. But qad has at least one problem that sets it apart from Henley—it cannot fairly say:

I am the master of my fate;
I am the captain of my soul.

3. ALN had also moved alternatively for dismissal of Count II (1) for its asserted failure to state a claim or (2) on the basis of issue preclusion. Because this opinion resolves the current motion on summary judgment grounds, it need not decide either of those alternate bases for dismissal. It may be observed, however, that both those grounds are problematic at best:

1. On its face Count II does appear to state a valid (albeit somewhat unclear) claim. Even so, qad has exacerbated that lack of clarity by its repeated attempts to modify the scope of the Count II allegations in its briefs attendant to the present motion.

2. ALN's assertion of issue preclusion is clearly misplaced. In that respect *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir.1987) (citations omitted) teaches:

1) the issue sought to be precluded must be the same as that involved in the prior action,
2) the issue must have been actually litigated,
3) the determination of the issue must have

been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action. ALN bases its issue-preclusion argument on a dictum in *qad v. ALN Associates, Inc.*, No. CV–90–2750–RSWL, slip op. at 8–9 (C.D.Cal. Sept. 10, 1990). But that order simply transferred to this Court claims identical to those contained in qad's Cross–Complaint—it was not a final judgment on those claims, and its description of the basis for the claims (in which the District Judge said that qad had there alleged only *threatened* activity by ALN, not any *actual* tortious interference) reflects no substantive decision or order on that issue. Even if the transfer order could somehow be reshaped as a final judgment (which it is not), the California court's determination of the issue underlying Count II was not "essential" to the decision to transfer the case, which is all that the order purports to do. *Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir.1990), quoting Restatement (Second) of Judgments § 27 (1982), explains:

Issue preclusion applies to a question that has been "actually litigated and determined by a valid and final judgment, [if] the determination is essential to the judgment."

4. Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case qad (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). Although both sides have cited incorrectly to the subparagraphs of this District Court's General

pute centers on certain rights to software originally authored by Hewlett–Packard Corporation ("Hewlett–Packard") and known as MFG/250 and FIN/250 (collectively "HP250 software"). Each of ALN and qad claims that the other's software infringes on the complaining party's asserted copyrights. Count II (the only one addressed by the present motion) advances the independent claim of ALN's alleged interference with qad's relationships with Hewlett–Packard and with qad's licensees.

In April 1980 Hewlett–Packard granted qad a license to use and sublicense HP250 software (P.Ex. C). qad contends that in part the license includes a "non-assignment, nontransfer clause."[5] qad has granted sublicenses for the HP250 software to approximately 50 customers and continues to support the product. qad also distributes MFG/PRO, which it says is "entirely distinct and separate from HP/250 Software" (P. Cross–Complaint ¶ 6b[6]).

ALN's alleged wrongdoing charged in Count II began with its acquisition from Hewlett–Packard on February 20, 1990 of the latter's ownership rights to the HP250 software.[7] On May 21, 1990 ALN sent a letter to qad (the "May 21 letter," P.Ex. B)

advising of ALN's ownership of "all rights" to the HP250 software and stating that ALN had cancelled any license that qad may have had to the HP250 software. Further discussion about the purported cancellation ensued in a May 24, 1990 telephone conversation (which also included some talk about settling this litigation).

Apart from the May 21 letter itself, a number of other facts are relevant to the current motion. Here they are:

1. Before ALN acquired the Assignment to the HP250 software rights, it had no knowledge of any "non-assignment, nontransfer" clause in Hewlett–Packard's agreement with qad. In fact, ALN received a copy of the qad license (which, as n. 5 reflects, itself contains no such clause) only in October 1990.

2. ALN also then had no knowledge of any of qad's expected business relationships.

3. As part of the May 21 letter ALN told qad:

In an effort to establish a comprehensive licensing program, ALN is contacting known users of the software product [HP250 software] to determine

---

Rule ("GR") 12(m) and 12(n) requiring factual statements in support of and in opposition to Rule 56 motions, they have tendered such statements (cited here as "D. 12(m)—" and "P. 12(n) —," respectively).

**5.** Solely for purposes of the current motion, the existence and meaning of that alleged clause are not in dispute. Hence nothing in this opinion is meant as a definitive interpretation or determination of the meaning of Hewlett–Packard's agreement with qad, including whether any such clause exists and, if so, its purpose and effect. All the same, this Court is constrained to make two comments on that score:

1. There simply *is* no such clause in P.Ex. C itself. Instead qad's Cross–Complaint ¶ 6b (see n. 6) quotes a limitation on transfer or assignment from another Hewlett–Packard document captioned "Terms and Conditions of Sale"—obviously a printed form used by Hewlett–Packard in conjunction with sales of its software.

2. It certainly strains credulity to suggest that the restraints in the latter document that render any purported conveyance of rights and obligations null and void would bind *Hewlett–Packard* (the owner) rather than its customer, so that Hewlett–Packard would be

disabled from selling its own property—its entire bundle of rights—to an interested purchaser such as ALN (subject of course to any preexisting rights of prior customers or licensees of rights to use that property).

**6.** This usage has been coined by this Court because the Cross–Complaint mistakenly includes two ¶ 6s. This opinion therefore refers to the first one as ¶ 6a and the second as ¶ 6b. Apart from that, a word of substantive explanation is in order here: ALN has just launched a challenge to the validity of qad's registered copyright of MFG/PRO, claiming that qad failed to disclose in its copyright registration that its software was derivative from HP250 rather than entirely original. ALN's motion seeking summary judgment on other qad claims in this lawsuit because of the claimed invalidity of MFG/PRO is now in the briefing stage and represents the next battlefield in this war.

**7.** qad alleges (Cross–Complaint ¶ 16b):

[D]efendants sought an Assignment ... for the purpose of interfering with qad., inc.'s business relations with Hewlett–Packard and with licensees of qad., inc.

But qad has offered no proof to support that allegation.

the scope and number of current licensees of the product.

But it has not yet done so.

4. Nor has ALN either cancelled or tried to cancel any other license to the HP250 software.

ALN also prepared a press release (part of P.Ex. C) that described the posture of this lawsuit and ALN's expectation that it would win its case against qad. It is by no means clear who saw the release. qad has shown that four of its MFG/PRO customers received it, but qad has offered no proof that any HP250 licensee was ever given a copy of the release.

While qad thus offers no evidence (1) that ALN communicated with any HP250 sublicensee from qad or (2) that any contract with any qad licensee was affected in any way by ALN's actions, for the first time qad asserts in its P. 12(n) ¶¶ 10–11 and 14 that ALN interfered with the relationships between qad and four of its MFG/PRO customers: Zoeller Corporation ("Zoeller"), TRW Valve Division ("TRW"), the Tech Group and EMS. However, this is the only material evidence that qad offers as to those companies:

1. qad admits (P. Response to D.Supp. 12(m) ¶ 19) that Zoeller has not breached any contract with qad, nor has qad suffered any damages from the loss of any economic advantage due to any actions allegedly taken by ALN (*id.* ¶ 23).

2. qad alleges that ALN communicated with TRW. However, the evidence shows that another company, Omegas Group, Inc. ("Omegas"), made the contact. Moreover, ALN's evidence shows conclusively that the Omegas contact was not as a result of any "instruction or authorization of ALN Associates, Mike or Sally Allen or Ronald Whiteford and

that Omegas Group was not an employee or representative or an agent of ALN Associates, Ronald Whiteford, or Mike and Sally Allen" (D.R.Mem. 12; see D.Ex. I and P.Ex. C).

3. Similarly, the only contacts with EMS and the Tech Group were made by James Subach ("Subach"), who has also never been a representative, agent or employee of ALN or any of its principals (D.Ex. H).

In sum, no contract between qad and any of its licensees has been breached as a result of any conduct by ALN. Nor has ALN disrupted any qad expectancy of entering into a valid business relationship. By definition, then, qad has suffered no damages as a result of any breach of any qad contract, and qad has suffered no damage as a result of any expected valid business relationship being disrupted by ALN.

### qad's Count II Claim

■ qad's central thrust in its Count II is the allegation that ALN intentionally disrupted the business relations between qad and Hewlett–Packard and between qad and its licensees, thereby causing qad to suffer damages. Though somewhat unclear, that pleading states a claim under either or both of two theories:

1. intentional interference with contractual relations or

2. intentional interference with prospective advantage.

California law provides a clear explanation of those common law torts.[8] *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 3–4, 791 P.2d 587, 589–90 (1990) (en banc) (citations omitted) puts the matter thus:

---

**8.** Because this is a diversity action, the familiar principles of *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) compel resort to Illinois choice-of-law rules. But that search need not be concluded (or even undertaken) where there is no substantive difference in legal rules as between the potential candidates for the source of law (see, e.g., *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 605 & n. 2 (7th Cir.1981)). qad argues that California law

should apply. Although ALN disputes that, it correctly notes that the relevant elements of tort law are applied similarly in all the states involved here: see, e.g., *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 386, 710 P.2d 1025, 1041 (1985); *Carmichael–Lynch–Nolan Advertising Agency, Inc. v. Bennett & Associates, Inc.*, 561 S.W.2d 99, 102 (Ky.App.1977); *Biggs v. Marsh*, 446 N.E.2d 977, 983 (Ind.App.3d Dist. 1983).

It has long been held that a stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract. The elements which a plaintiff must plead to state a cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

The tort of interference with prospective economic advantage protects the same interest in stable economic relationships as does the tort of interference with contract, though interference with prospective advantage does not require proof of a legally binding contract.[2] The chief practical distinction between interference with contract and interference with prospective economic advantage is that a broader range of privilege to interfere is recognized when the relationship or economic advantage interfered with is only prospective.[9]

---

[2] We recently noted the elements of the tort: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."

9. [Footnote by this Court] This opinion need not address this or any other distinction between the two essentially similar torts (the dividing line between the two varies from state to state) because qad has failed to show any evidence to support the necessary elements common to both. *Pacific Gas & Electric, id.* at 1128 n. 4, 270 Cal.Rptr. at 5 n. 4, 791 P.2d at 591 n. 4 recognized the overlapping quality of the two torts but likewise declined to resolve the problem of distinguishing fully between them (or even to resolve the question whether they should be treated as separate torts at all), electing instead to decide the case using their common elements.

10. *Skagen v. Sears, Roebuck & Co.*, 910 F.2d 1498, 1500 (7th Cir.1990) echoes part of the message of *Celotex, id.* and Rule 56(e):

Because qad neither alleges in Count II nor offers evidence in its P. 12(n) statement that any contract was breached, its only potentially viable claim in Count II might be that ALN disrupted qad's contractual or economic relationships with Hewlett–Packard or with qad's licensees.

Whatever may be the points of separation between those two possible variants of the same general tort, they share common elements that qad must satisfy to win its case—or, in the present context, as to which qad must show some genuine dispute of material fact to avoid summary judgment. For example, to become liable under either theory ALN must have known about the specific relationship with which it was interfering and must have intentionally caused some actual interference resulting in damages to qad.

As discussed below, qad has offered no proof as to either of those elements and thus cannot avoid summary judgment (*Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53).[10] In sharp contrast, ALN has offered proof in its D. 12(m) statement of its innocence as to every alleged occurrence of interference. Then, rather than attempting to rebut ALN's statement, qad has chosen to meet every proof by ALN that qad's allegations are false with a new set of allegations—but they in turn are also baseless. In short, Count II seems to take on a new form with every successive brief. Before qad seizes the opportunity to present yet another moving target, this opinion will address its allegations that have manifested themselves to this point.[11]

> When a motion is made for summary judgment in a case, an adverse party may not rest upon mere allegations or denials of the adverse party's pleadings but the adverse party's response must set forth specific facts showing that there is a genuine issue for trial.

qad has failed to set forth *any* specific facts to show that there is any genuine issue for trial. Thus the material (that is, outcome-determinative) facts as represented by ALN must be deemed admitted under GR 12(n).

11. qad's moving-target tactics have most recently taken the form of its submitting an unbidden "Plaintiffs' Response to Defendants' Reply Regarding Defendants' Motion for Summary Judgment of Count II," comprising a further memorandum and what it labels as new evidence to support its claim. That kind of unauthorized

*Lack of Damages*

Before it thus turns to each of qad's specific allegations, this Court must point out that *all* the allegations in Count II have a common fatal flaw. One of the essential elements in every tortious interference case is that the plaintiff show that it suffered damages as a result of the defendant's tortious acts. And as already explained, that applies whichever branch of the interference tort a plaintiff is attempting to bring into play.

Nevertheless, qad has failed to offer any proof of actual damage to the relationships between qad and its customers or between qad and Hewlett–Packard. Instead qad simply asserts (P.Mem. 15):

> The fact of such damages must be presumed to exist for purposes of this motion.

That is purely and simply wrong. Once ALN has put the matter in issue under Rule 56, it is qad's burden to support *every* element of its claim in factual terms—and its failure on any one of them means there is no genuine issue of material fact to avoid summary judgment as a matter of law (*Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53). On this ground alone ALN's motion must be granted.

But that is not all. As the ensuing discussion reflects, there are other independent bases upon which ALN's motion is necessarily successful.

*qad's Contractual Relationship with Hewlett–Packard*

One of Count II's allegations is that ALN interfered with qad's relationship with Hewlett–Packard. On the evidence the only such relationship that qad has identified is Hewlett–Packard's license of the HP250 software to qad. It has become plain from qad's brief that its tortious-interference claim refers both to ALN's initial purchase of the rights to that software and to ALN's later purported cancellation of qad's rights to the software.[12]

First, as a matter of law ALN's initial act of purchasing the HP250 software from Hewlett–Packard was not a tortious interference with qad's relationship with Hewlett–Packard. That tort is one of *intentional* interference. But when it made its purchase ALN did not know of any purported "non-assignment, nontransfer" agreement between qad and Hewlett–Packard. Moreover (and as an added ground for dismissal) there is no evidence that either a breach or disruption of any contractual relationship between Hewlett–Packard and qad has ever occurred as a result of ALN's obtaining the rights to the HP250 software.

Second, ALN's purported cancellation of qad's rights to the HP250 software did not tortiously interfere with the relationship between qad and Hewlett–Packard. Importantly, if ALN's earlier transaction with Hewlett–Packard operated to place ALN into the ownership of the HP250 software, ALN's attempted cancellation as to qad would have been an "interference" with its *own* contract, not Hewlett–Packard's—and it is black-letter law that the torts that qad

---

effort at self-help by a litigant after all the parties' scheduled submissions have been filed raises an initial question as to whether the newly-proffered evidence is really "new," or only an afterthought that the party should have put to the court in the first place. But even if the material *is* new, that poses a dilemma:

> 1. If leave to file such new material is granted, it bids fair to expand the dispute indefinitely by added requests of the same kind, so that the court has no ability to resolve the issue.
> 2. If leave to file is denied, the tendering party will invariably claim prejudice whether there was any or not.

In this instance that potential dilemma does not exist, for the newly-proffered materials do not raise any genuine issue of material fact. Leave to file is accordingly granted—albeit with reluctance lest qad's counsel regard that as a license to engage in further disregard of court rules and rulings in the future.

**12.** qad says that ALN tortiously interfered with qad's relationship with Hewlett–Packard (P.Mem. 5):

> The intention of defendants to interfere with qad's contractual and prospective business relationships is clearly shown from ALN's purported cancellation of qad's contract with Hewlett–Packard.

qad also states (P.Mem. 6) that ALN is continuing to interfere with that contract by sending an October 10, 1990 letter to Hewlett–Packard (P.Ex. E).

tries to charge here simply do not apply to such activity.[13] And independently of that, again qad has offered no evidence to show that at that time ALN knew about the asserted "non-assignment, nontransfer" agreement between qad and Hewlett–Packard[14] or that ALN intended that its letter to qad would breach or disrupt that contract. And even if ALN had known about that agreement, there is no evidence that any disruption occurred. qad itself has "denied that any such cancellation was or would be effective" (P. 12(n) ¶ 6).

Third, ALN's further pursuit of its claim in the court system is also not tortious for the reasons well explained in *Pacific Gas & Electric,* 50 Cal.3d at 1130–36, 270 Cal. Rptr. at 7–11, 791 P.2d at 593–97 (which reflects universally applicable law as to the erection of a shield against tort liability ascribable to a party's bringing legitimate disputes to court for their resolution). And as for ALN's October 10 letter to Hewlett–Packard, that clearly relates to ALN's dissatisfaction with Hewlett–Packard's plan to give qad "additional rights" to HP250 programs. That too cannot be characterized as an improper interference with prospective advantage. ALN has every right to use legal means to urge Hewlett–Packard not to enter into a new agreement with ALN's competitor qad (see Restatement (Second) of Torts ("Restatement") § 768[15] (1979)) or to use legal action to prevent what it believed to be a violation of its own copyrights to the software.

*qad's Relationship with its HP250 Licensees*

■ qad also asserts that ALN communicated with qad's HP250 licensees and attempted to disrupt qad's relationships with them. It bases that contention solely on the earlier-quoted statement by ALN in its letter to qad cancelling qad's rights to the HP250 software:

> In an effort to establish a comprehensive licensing program, ALN is contacting known users of the software product to determine the scope and number of current licensees of the product.[16]

But the common sense meaning of the term "is contacting," thus used as part of an introductory statement in ALN's letter to qad, is as an explanation of why ALN was communicating with qad. Of course it also suggests the possibility that ALN was going beyond that one contact with qad to communicate with other users of HP250 software known to ALN. But the letter does *not* in fact show, nor does the letter's reference to "current licensees" carry the message, that ALN was in touch with any of *qad's* customers either then or later. To the contrary, ALN has *not* reached any of qad's HP250 customers (D. 12(m) ¶¶ 7–8, based on D.Ex. C ¶¶ 6–7):

> 7. ALN has not cancelled or tried to cancel any other license to the HP250 software.
>
> 8. ALN has not contacted any of qad's licensees for the HP250 software.

13. Even if ALN's acquisition were somehow legally flawed (and nothing suggests that it was), there is no evidence that ALN knew of any such defect—once more negating the possibility of any intentional tort.

14. While it has unquestionably been shown that ALN did not know of any "non-assignment, nontransfer" agreement between Hewlett–Packard and qad when ALN received the copyrights to the HP250 software, it is not clear when it began to have any knowledge of qad's rights. What has been established, however, is that ALN tried to get a copy of qad's agreement with Hewlett–Packard but did not receive one until the fall of 1990. Indeed, ALN's purported cancellation (D.Ex. B) of qad's license for HP250 software ("if any") clearly states that ALN has

no record of "any existing license to qad for the software products." Of course it is qad's burden to show ALN's knowledge of the "non-assignment, nontransfer" agreement. And qad has not shouldered that burden.

15. Although n. 3 has referred to another Restatement, all further references to the American Law Institute's work product will advert to the Restatement (Second) of Torts. No confusion should therefore be occasioned by simply using "Restatement" as a shorthand term for the latter.

16. [Footnote by this Court] qad mischaracterizes that statement in its P. 12(n) ¶¶ 7–8 by saying that "ALN's counsel ... stated ALN would contact all HP/250 licensees."

Moreover, no contract between qad and any of its own licensees has been breached.[17]

In short, qad has failed to show that there is any genuine basis for imposing liability on ALN for interfering with qad's relationships with its HP250 sublicensees. That claim also fails.

*qad's Relationship with its MFG/PRO Customers*

■ qad's conduct on the current motion offers another instance of what has become increasingly apparent about its case as this litigation wears on. Unable to rebut any of ALN's evidence that it was innocent of any wrongdoing as to qad's relationships with Hewlett–Packard or its own HP250 sublicensees, qad responded by offering *new* allegations of purported wrongdoing by ALN—and they have proved equally empty (see n. 11).

*Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir.1989) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)) teaches:

> It is a basic principle that the complaint may not be amended by the briefs.... [18]

For the first time qad's P. 12(n) ¶¶ 10–11 and 14 state that ALN interfered with the contractual relationships between qad and its MFG/PRO customers. But Count II does not mention MFG/PRO customers as such—instead it speaks only in terms of "Hewlett–Packard and the licensees of plaintiffs." Although Count II does not in terms define "licensee," it seems plain from the rest of the pleading—as well as from the history of this case—that the licensees spoken of there are HP250 software users, not MFG/PRO customers.[19] Quite understandably ALN did not address the latter issue (or nonissue) in its initial memorandum, and it has expressed justifiable concern about such an expanded claim in its R.Mem. 2 n. 2.

But even leaving aside the question whether qad could plausibly argue that its contention as to its MFG/PRO customers could have been divined from Count II's use of the word "licensee," it has become clear from the parties' submissions that qad had no factual basis upon which to support that contention anyway. As stated earlier, qad's claim is purportedly based on "facts" showing that ALN communicated with qad's MFG/PRO customers Zoeller, TRW, Tech Group and EMS. Once more qad's assertions prove wholly unfounded.

■ First, ALN approached Zoeller for the proper and legal purpose of seeking its business. ALN may do so without fear of becoming liable for interfering with any prospective business relationship between qad and Zoeller. Restatement § 768 Comment a explains:

> [C]ompetition is not an improper basis for interference [with a prospective contractual relation]. If one party is seeking to acquire a prospective contractual

17. qad offers no evidence to rebut ALN's statement of this fact. It offers instead ALN's allegation that qad's license had been terminated. At the same time, P. 12(n) ¶ 6 denies that any termination occurred or "would be effective." If no termination indeed occurred or would occur and if ALN did not communicate with any HP250 licensees, there is no possibility that ALN's letter to qad purporting to terminate qad's license to the HP250 software interfered with any of qad's contractual relations. And on the other side of the coin, if ALN's purported termination of qad's HP250 license *were* effective under the terms of the operative documents among Hewlett–Packard, qad and ALN, any consequent impairment of the rights of qad's sublicensees of that software would be legally privileged.

18. [Footnote by this Court] *Thomason* and *Car Carriers* involved motions to dismiss, but their reasoning is equally appropriate to a summary judgment motion. Any defendant, in filing such a motion, must be entitled to rely on the existing complaint to know what it must counter by its own evidentiary submission. And the plaintiff, having thus specified the field of combat in the first place and finding itself defeated there, cannot simply try to move to another arena altogether.

19. For example, qad refers in its Cross–Complaint ¶ 14 to its "sublicensees" (a term used by ALN in its May 21 letter, which purportedly cancelled qad's HP250 software license and which did not mention MFG/PRO software or any other customers of qad). As Count II appears to hinge off of that letter (see Cross–Complaint ¶ 14, incorporated by reference into Count II), it seems plain that the "licensees" that qad refers to in Count II are those sublicensees of the HP250 software, not other qad customers.

relation, the other can seek to acquire it too.[20]

ALN President Sally Allen stated (D.Ex. I) that ALN was attempting to sell Zoeller a computer hardware system. qad does not dispute that, but in fact admits (P. Response to D. 12(m) ¶¶ 19–23) that no contract it had with Zoeller has been broken or interfered with and that it was:

> currently unaware of any lost economic advantage due to ALN's conduct regarding Zoeller Company.

qad's admissions show that it has never had any factual basis for its allegation that ALN interfered with its current or prospective contractual relations with Zoeller.

■ Second, qad's allegation that ALN tortiously interfered with qad's business relationship with TRW is equally without merit. qad's own submission (P.Ex. C) shows that the contact with TRW Valve was made by Omegas. And that company was not acting as an agent, employee or representative of ALN. Without some intentional action by ALN to interfere with qad's relationship with TRW, ALN plainly has committed no tort here.

Finally, qad's remaining "evidence" about its MFG/PRO customers, relating to Tech Group and EMS, is likewise without foundation. qad's only offer of proof here is the statement by its Pamela Lopker (P.Ex. D), which is wholly lacking in any substantiation for its assertions about which she has no firsthand knowledge. She says that Subach made those contacts for ALN. But neither Subach nor his company is or was an employee or a representative or agent of ALN (D.Exs. H and I). Thus that claim too dissolves under examination.

*ALN's Press Release*

■ In another attempt to broaden the scope of its original Count II, qad's presentation of its additional facts (P. 12(n) ¶ 3) says that ALN published a press release that interfered with its relationships with Zoeller, TRW and Tech Group. It further states (P.Mem. 7) that "ALN released the entire matter to the public by virtue of its press release to the industry, seeking wide distribution to all including, presumably, all HP250 users"—although it presents no proof that anyone other than the MFG/PRO customers received copies of it.

qad (again!) has failed to offer any evidence that the press release caused it any damage or that the use of the release was wrongful (see Restatement § 768). But once more those missing elements of any such claim—fatal gaps in themselves—are only part of the story. In this instance the equally fundamental element of the release's untruthfulness is lacking, for the only elements of the press release that qad claims are untrue are (1) the release's use of the word "lawsuit" rather than "claim" or "count" to describe qad's trade-secret count that this Court had dismissed and (2) the release's failure to detail all other elements of qad's pending suit against ALN.

qad is itself guilty of the very kind of misrepresentation that it tries to ascribe to ALN. In fact the ALN release makes it quite plain that the entire suit has not been dismissed, but is rather ongoing. Here is the full paragraph to which qad refers (emphasis added):

> The suit, pending in the federal court in Chicago, primarily charged that ALN violated the trade secrets and copyrights which qad claims protect its manufacturing and accounting software entitled MFG/PRO TM. With dismissal of the trade secret charges, the suit *is now*

---

20. [Footnote by this Court] A competitor is immune from a suit for interference with prospective economic advantage of another competitor unless its acts are either "improper" (*A–Mark Coin Co. v. General Mills, Inc.*, 148 Cal.App.3d 312, 323–24, 195 Cal.Rptr. 859, 866–67 (2d Dist. 1983) (California law)) or "illegal" (*Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 542 (7th Cir.1986) (Indiana law; see also *id.* at n. 6 discussing the language and meaning of the relevant Restatement provisions (identical to California law) and the corresponding standard in Indiana)); see also *Watson Rural Water Co. v. Indiana Cities Water Corp.*, 540 N.E.2d 131, 139 (Ind.App. 1st Dist.1989) (affirming summary judgment due to plaintiff's failure to show "illegal" act by defendant in a tortious interference with prospective advantage claim). ALN is immune under either standard.

*focused* on qad's alleged copyrights. ALN contends that qad's copyrights are invalid, and even if valid, are not infringed by ALN's software.

Then the following paragraph continues: "Following dismissal of the trade secret claim...." There is only one fair reading of the release: There is an action still "pending," of which one qad claim has been dismissed and in which qad's claim of "alleged copyrights" remains.

No reasonable person could find that ALN's characterization of the facts is untrue, and that necessarily means it is not tortious (see 2 Callman, *Law of Unfair Competition and Trademarks and Monopolies* ¶ 11.12 and cases cited there (L. Altman 4th ed.1982); see also, for example, Cal.Civ.Code § 47 (Deering 1990)). But even had the release been untrue or misleading (as it is not), qad has offered *no* evidence that the release's use of "lawsuit" instead of "claim" and the absence of a full account of qad's claims against ALN— which, as evidenced by qad's briefs on this motion, are constantly in flux—caused any damage to qad's business relationships with its licensees.

\*    \*    \*

Once the vacuousness of qad's assertions as to its HP250 licensees and its MFG/PRO customers was made evident by ALN's Reply, qad petitioned this Court to file the further claimed response referred to in n. 11. But as n. 11 indicates, not only does that response fail to rebut ALN's showing that it did not interfere with qad's relationship with Zoeller, TRW, Tech Group or EMS, it incredibly attempts to introduce *new* allegations of ALN's supposed interference with other qad customers. Although this Court has elected to entertain that submission, it has made no difference because it is empty of any outcome-determinative factual issue.

It has already been noted that qad's Count II seems to take on a new form every time ALN attempts to circumscribe its substance with each offer of evidence. Justifiably frustrated by those protean tactics, ALN has no choice but to bind qad with a chain (as was done with Proteus) in

an effort to force qad to desist from such unceasing metamorphosing of Count II. That chain is the summary judgment procedure as outlined in GR 12(m) and 12(n) and as explicated in *Celotex*.

qad had ample opportunity in its P. 12(n) statement to rebut ALN's evidence and to offer evidence to support its claim. But unlike the sagacious Proteus, who was ultimately compelled to tell all things when held fast in his chains, qad has nothing of substance to say. And because Count II has been shown to contain no factual basis whatever, ALN's motion for summary judgment must be and is granted.

### Conclusion

There is no genuine issue of material fact as to qad's Count II claim. ALN is entitled to a judgment as a matter of law on that count, which is dismissed with prejudice.